219 So.2d 616 (1969)
Mildred Moreau Ledoux HOUSE et al., Plaintiffs and Appellants,
v.
TIDEWATER OIL COMPANY et al., Defendants and Appellees.
No. 2503.
Court of Appeal of Louisiana, Third Circuit.
January 29, 1969.
Rehearing Denied February 20, 1969.
Writ Refused April 25, 1969.
*617 Davidson, Meaux, Onebane & Donohoe, by Joseph Onebane and Duncan M. Smith, Jr., Lafayette, for plaintiffs-appellants.
Henican, James & Cleveland, by Murray F. Cleveland, New Orleans, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, by Lucius F. Suthon, New Orleans, for defendants-appellees.
Liskow & Lewis, by James L. Pelletier, Lake Charles, for plaintiff-appellee.
Before FRUGÉ, HOOD, and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a suit to cancel two oil, gas and mineral leases. Plaintiffs are the owners of the land. Defendants are the owners of the leases. From an adverse judgment, the plaintiffs appeal.
The principal issue is whether the defendants complied with the lease provisions requiring that they commence "reworking operations" within 90 days after the cessation of production in order to continue the leases in effect beyond their primary terms.
The two leases in question were granted in July of 1954, for primary terms of five years, to Mr. F. J. Muller, covering a total of about 310 acres in St. Landry Parish. They were assigned by Muller to Tidewater Oil Company. During the primary terms of the leases, portions of the leased premises were included within a unit from which gas was being produced by Tidewater from a well located on lands owned by Robert L. Waterbury. The well produced gas and condensate in paying quantities *618 until August 6, 1960, at which time Tidewater abondoned it due to excessive amounts of salt water.
Robert L. Waterbury, on whose lands the well was located, was an experienced independent oil operator. He decided that he could restore the well to production. Accordingly, he acquired the leases and on September 5, 1960, he commenced operations to restore production. From September 5 through October 1, 1960, he and a crew of men repaired approximately one mile of board road across a swampy area to the well site. They replaced some boards, repaired others and reset the necessary cattle gaps. Then he built completely new triple matting around the well head to support heavy equipment which he planned to use.
On October 30, 1960, a "wire line service unit", mounted on a three ton truck, was moved to the well site. This equipment consists of a wire rope, about the size of an ordinary clothes line, to which are attached sinker bars, jars and a paraffin scraper. This was lowered into the tubing of the well to a depth of about 10,300 feet. After about 8½ hours of work, pulling the paraffin scraper in and out of the hole, an accumulation of paraffin and debris was removed and the well began to flow gas and condensate. This was on October 30, 1960, which was the 85th day after the cessation of production on August 6, 1960.
Production was periodically flared to the pit, to keep the well clean, until new flow lines and a tank battery could be installed. These were completed on November 25, 1960, from which date gas and condensate have been produced and saved in paying quantities. This was the 111th day after cessation of production.
Waterbury testified he spent about $65,000 to restore the well to production.
The lease provisions in question are contained in paragraph 6, which reads as follows:
"After the discovery and production of oil, gas or any other minerals in paying quantities, either on the leased premises or on lands pooled therewith, the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals herein above provided for so long as oil, gas or some other mineral is being produced in paying quantities, or Lessee is carrying on operations with reasonable diligence looking to the production thereof. It is provided, however, that if, after the discovery and production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause, this lease shall terminate unless Lessee resumes or restores such production, or commences additional drilling, reworking or mining operations within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of reworking operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals. * * *"
It is not disputed that there was a cessation of production, within the intendment of the above quoted lease provisions. Plaintiffs' principal contention is that within the ensuing period of 90 days there was neither (1) restoration of production in paying quantities nor (2) commencement of reworking operations in an effort to restore production. Plaintiffs argue that the things done by Mr. Waterbury amounted to nothing more that routine maintenance, as distinguished from reworking operations.

I. WAS PRODUCTION IN PAYING QUANTITIES RESTORED WITHIN 90 DAYS?
We pretermit the question of whether production in paying quantities was restored within the 90 days. For, regardless of this question, we find hereinafter that reworking operations were commenced within this period.

*619 II. FAILURE OF LESSORS TO GIVE NOTICE THAT THE WORK BEING DONE BY WATERBURY DID NOT CONSTITUTE REWORKING
Defendants contend that the following notice provisions of the lease are applicable here:
"In the event that lessor at any time considers that the operations are not being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if legally required to conduct operations in order to maintain the lease in force, shall have sixty (60) days after receipt of such notice in which to commence the necessary operations to comply with the requirements hereof."
Under this lease provision, defendants argue that plaintiffs were required to notify Mr. Waterbury of any dissatisfaction with the reworking operations.
This argument has been answered by the jurisprudence. See Taylor v. Buttram, 111 So.2d 576 (La.App.2d Cir. 1959) where the court held, with citation of previous cases:
"As to the appellants' contention that Section (8) of the lease contract required lessors to give lessee sixty days notice of any alleged failures to rework before any suit could be filed, this provision obviously applies only to operations during the primary term of the said lease, while Section (2) thereof applies after the primary term has expired. This exact point was squarely decided adversely to the contentions of the appellants here in the following cases: Logan v. Blaxton, La.App. 2 Cir., 1954, 71 So.2d 675; Taylor v. Kimbell, 1951, 219 La. 731, 54 So.2d 1; Sitting v. Dalton, 1940, 195 La. 765, 197 So. 423; Producers Oil & Gas Co. v. Continental Securities Corp., 1937, 188 La. 564, 177 So. 668."

III. COMMENCEMENT OF REWORKING OPERATIONS
Plaintiffs contend the work done by Mr. Waterbury constituted routine maintenance and not "reworking". They introduced the testimony of three expert witnesses who stated, in essence, that "reworking operations" are limited to those which affect the ability of the producing formation to feed into the well bore. These witnesses stated further that paraffin frequently accumulates in gas wells and the removal thereof with a wire line service unit is rountine maintenance. They concluded that in the present case the combined operations conducted by Waterbury constituted maintenance and not "reworking".[1]
*620 Defendants called two expert witnesses who testified that although the use of a wire line service unit alone is maintenance, the wire line operations performed here were a part of an overall work-over operation. These experts were of the opinion that work-over operations cannot be limited, under all circumstances, to those which affect the ability of the formation to feed into the well bore. They gave a much broader definition to the term "reworking operations" and concluded that the work done by Mr. Waterbury in this case fell within that category.
The first of defendants' experts is Mr. Fred L. Bates, who has very impressive qualifications. He graduated in mining engineering from Princeton University in 1933 and is a member of the Advisory Council of the School of Geological Engineering of that institution as well as being a member of the faculty of the University of Southwestern Louisiana as a lecturer in petroleum geology and petroleum engineering. Mr. Bates also has an impressive background of practical experience as a consulting petroleum engineer. He testified as follows:
"Q. Mr. Bates, I think you stated that using a paraffin scraper was a work over or reworking operation?
"A. No, sir, I did not. I stated that wire line operations such as were *621 performed here were a part of a work over operation.
"Q. Because it restored production?
"A. No, sir, because it was a logical step in proceeding with a work over. As Mr. Montgomery stated, the repair of the board road and the entering of the well with wire line tools were the first steps that a reasonable and a prudent operator would have taken.
"Q. Mr. Bates, what do you mean work over, what does that mean, what are you working over?
"A. Mr. Montgomery was asked to define the term, and I think he defined it rather well. With the exception that he said it was an operation to affect the production from a well. My definition would take exception with the work affect, and say that a work over is an operation to improve or restore production, not merely to affect, but an attempt to improve and restore production.
I believe that the physical operations which are performed in this case and as admitted by Mr. Montgomery did have the effect of restoring production for whatever reason, and believing that and seeing the evidence, I would consider this as a part of a work over operation."
Mr. William G. Blackwell, the other expert witness called by defendants, has a degree in geological engineering from the Colorado School of Mines in 1939 and extensive practical experience. He testified as follows:
"Q. Now, what is the principal purpose of a reworking or work over operation?
"A. The principal purpose of a work over is to ultimately restore oil or gas production.
"Q. If you had been in Mr. Waterbury's place and you had a farm out agreement under which you had undertaken to re-work this well or to engage in reworking or work over operations, would you have proceeded the way Mr. Waterbury did?
"A. Exactly.
"Q. And after you had gotten the production that Mr. Waterbury got, would you have discontinued the reworking operations as he did?
"A. Yes.
"Q. Would you state whether you believe that these activities of his in restoring the board road and in engaging in the wire line operations were conducted with reasonable diligence looking toward the production of minerals?
"A. I think so."
There are at least three Louisiana cases which have considered the question of "reworking". Most important of these is Texas Company v. Leach, 219 La. 613, 53 So.2d 786 (1951). The facts showed that the well gradually decreased in production to five barrels of oil per day. Finally, the tubing burst. The operators closed the well down and contracted with a drilling company to work the well over. During the 60-day delay, provided by the habendum clause, the following operations were conducted in preparation to restore production: Relegged derrick; pulled tubing; stengthened and reinforced bridge; doped tubing and rods; repaired gas lines; racked and doped tubing; repaired roads and bridges; prepared for cable tooling. After the 60-day period, the operations continued until the well was brought back into production.
In holding that the operations conducted by the Texas Company constituted reworking operations sufficient to maintain the lease beyond its primary term, the court held:
"We believe that the operations conducted by the Texas Company between September 10 and November 26, 1947, *622 were sufficient to conform with the provisions of their contract. Operations of a similar nature under a lease which obligated the lessee to `commence operations' within a certain period of time `by drilling, boring or mining for oil' have been held to be the commencement of work `which satisfied the condition of the lease'. See Hudspeth et al. v. Producers' Oil Co., et al., 134 La. 1013, 64 So. 891, 893."
In Johnson v. Houston Oil Company of Texas, 229 La. 446, 86 So.2d 97 (1956), the lease provided for termination unless oil or gas was being produced in paying quantities or "drilling or reworking operations" were being conducted on June 27, 1954. A well drilled during the latter part of 1953 showed the presence of oil, but it was plugged with concrete. On the crucial day, June 27, 1954, the operator moved a drilling rig, pump, rotary and kelly joint to the well site, assembled them, and commenced to drill out the cement plug. Production was actually obtained. The court held:
"Under these circumstances we would not be warranted in disturbing such findings of fact; and we hold, as did the trial judge, that plaintiff was actually engaged in reworking operations on June 27. See Texas Co. v. Leach, 219 La. 613, 53 So.2d 786."
In Harry Bourg Corporation v. Union Producing Company, 197 So.2d 172 (La. App.1st Cir. 1967, writ refused), the lease provided for the periodic commencement of operations to drill a new well or "rework" an existing well. The operations in question consisted of placing a cement plug at the 14,800 feet depth in an existing well and moving up in the hole and making new perforations at 14,500 feet. Three experts testified this was "reworking" and defined the term. Mr. Drew Cornell, a petroleum engineer of 22 years experience, defined "reworking" as: "It is to restore or increase production of a well that has been drilled, usually the second attempt." Mr. L. C. Aycock, a petroleum geologist, testified: "The word means to work again on a well. It is used in reference to work on wells that have never produced or work on wells that have produced, used in connection with a well that has never produced. * * * In a well that has produced it would be an operation when the well came off of production or ceased production, and it would be an operation to maintain, restore, improve production. * * *" Mr. Donald Mast, a geologist, stated: "My understanding of the term is any process or procedure which you may undertake to either regain, increase or create new production in a well."
In the Harry Bourg Corporation case, the court held:
"We find from the testimony of the three experts, quoted supra, that the word `rework' has a definite, even though multiple, meaning in the oil and gas industry, and accordingly we are bound to accept this meaning in the sense in which it was used on this compromise agreement, the subject matter of which was an oil, gas and mineral operation."
We note particularly that not one of the three cited cases, nor any of the experts mentioned therein, limits the term "reworking" to operations which affect the ability of the formation to feed into the well bore. In the Harry Bourg Corporation case, which quotes the expert testimony, the definition of "reworking" given by these witnesses is substantially the same as that given by defendants' experts in the present case, i. e., it is an operation to obtain production in a well which was completed but never produced or to maintain, restore or improve production in a well which ceased to produce and has been abandoned.[2]
*623 Plaintiffs cite several cases from other states which discuss "reworking". Not one of them restricts the term to operations which "affect the ability of the formation to feed into the well bore", as contended by plaintiffs' experts. Furthermore, we find no such restricted definition suggested in either the text or the citations in Summers, Oil and Gas, Vol. 2, Sections 305 and 349. In short, plaintiffs have not cited, nor have we been able to find, any authority which supports their definition.
Like the courts in the three cited Louisiana cases, we also will not attempt to give a comprehensive definition of "reworking operations" applicable in every case. Each case must depend upon its own facts, in the light of the opinions of the expert witnesses who testify. In our view, the operations conducted by Mr. Waterbury in the present case clearly constituted reworking. We attach particular significance to the following facts: The well had actually ceased to produce and had been abandoned by the original operator, Tidewater. Mr. Waterbury purchased the leases from Tidewater and, as a new operator, commenced efforts to restore the well to production. He and a crew of men repaired one mile of board road and built completely new triple matting around the well to support heavy equipment which might be needed. After the wire line service unit was successful in removing paraffin and debris from the well, it actually returned to production. Waterbury then had to install new flow lines and a new tank battery. These operations were all conducted reasonably, diligently and in good faith, and were actually successful in restoring production. Certainly the operations conducted by Waterbury were more than routine maintenance by an operator to maintain production.

IV. THE UNIT WELL DID NOT PRODUCE AS A GAS WELL
Plaintiffs contend that since the unit was created by the Conservation Commission for the production of gas, and the records show that during the period from January 1, 1961 through October 1, 1961, the well primarily produced liquid condensate,[3] such *624 production did not maintain the non-drilled leases at issue here. Plaintiffs contend that condensate is oil, not gas, and they cite Auzenne v. Lawrence Oil Company, Inc., 179 So.2d 533 (La.App.3rd Cir. 1965) to support their position.
Without discussing the Auzenne case, the short answer to plaintiff's argument in the present matter is that Department of Conservation Order No. 257-A-1 effective November 15, 1956, created this unit for the production of "gas and liquid hydrocarbons" from the sand in question. Liquid condensate is certainly liquid hydrocarbon. See LSA-R.S. 30:3(4, 5). Hence, the unit was created for its production, as well as gas.

V. DELAY IN PAYMENT OF ROYALTIES
After the Waterbury well was restored to production on November 25, 1961, the unit was revised by the Department of Conservation by order dated March 9, 1962. No royalties were paid to plaintiffs until October of 1962. Mr. Waterbury explained that the creation of the new unit caused delays to secure the necessary surveys and accomplish the required title work, execution of division orders, etc.
The trial court held under the circumstances that this delay in the payment of royalties was not unreasonable. There was a delay of between six and seven months between the time the unit was revised and the time the payment of royalties commenced. For the reasons set forth in Fawvor v. United States Oil of Louisiana, Inc., 162 So.2d 602 (La.App.3rd Cir. 1962), we do not think this was an unreasonable delay under the circumstances.

VI. TERMINATION OF LEASES UPON DISSOLUTION OF ORIGINAL UNIT
The 1954 leases were maintained beyond their primary terms by being included within a unit created by Department of Conservation Order No. 257-A-1, effective November 15, 1959, establishing Unit No. 21-2, for which the Waterbury well was subsequently designated as the unit well. Order 257-A-4, effective January 1, 1962, dissolved said Unit 21-2. Hence, plaintiffs contend their leases terminated because they were beyond their primary terms and the unit which had served to maintain them was dissolved.
However, the defendant points out that when Unit No. 21-2 was dissolved by Order No. 257-A-4, a revised unit was simultaneously established, which existed until Order No. 257-A-5, effective March 9, 1962, created Revised Unit 21-2, for which the Waterbury well is the unit well and which unit includes portions of the leases at issue here. The result is that there was uninterrupted production in which plaintiffs' leases shared. Hence, plaintiffs' leases were not terminated.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the plaintiffs appellants.
Affirmed.
FRUGÉ, Judge (dissenting).
I respectfully dissent from the majority opinion, in this case, in that the operations conducted were not "reworking".
In the trial of this case five experts were called to testify. Of these five, three testified that the term "reworking", as used and understood in the oil industry, means the conducting of any operation which affects *625 the ability of the producing formation or horizon to feed into the well bore. The other two experts gave a broad definition wherein any operation, which was successful in the restoration of a nonproducing well, "was reworking".
The majority says it is not willing to give a comprehensive definition of the term "reworking operations" but would rather "[let] each case * * * depend upon its own facts in the light of the opinion of the expert witnesses who testified". This refusal by the majority to announce at least some definition of the term "reworking" I feel simply promotes further litigation of an issue which was squarely presented to this court and which should have been decided once and for all.
The majority ruled that in the present case what was done "clearly constituted reworking", and it attached significance to facts which we feel had nothing to do with what the industry considers to be reworking. On the one hand, the experts whose testimnoy the majority evidently accepts, saw "success" as the key to the definition. So, subtracting success from the factors considered by the court, the decision would have gone the other way. Without wanting to do so the court has followed a definition which would allow any operation, as long as successful, to be considered reworking, no matter what operations were conducted.
On the other hand, this definition would keep a lessee who conducts genuine reworking operations from maintaining the lease unless he is successful.
The fallacy of this definition based on "success", is even more obvious when one notes that in this case there was no "success" in that "production in paying quantities" was not restored until after the end of the ninety-day period.
As well, the majority ruling creates the danger that any lessee who conducts operations similar to those in this case, which the majority of the experts considered to be only routine maintenance operations, could maintain a non-productive lease indefinitely. Again the lack of a proper definition may cause future problems.
The majority says it is unable to accept the more logical definition given by the majority of the experts because there is a lack of authority. When the majority speaks of lack of authority they seem to overlook that this State's own Conservation Department obviously does not recognize what was done as reworking, in that it demands that prior to conducting operations consisting of "reworking", whatever the definition may be, a permit for such must be obtained from the Department. No such permit was obtained.
As to the jurisprudence mentioned by the majority in its opinion, a reading of the decisions rendered in Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 (1951) and Johnson v. Houston Oil Co. of Texas, 229 La. 446, 86 So.2d 97 (1956), reveals that in neither of these cases was the court facing the same issue as that here presented. In both of those cases, there was no question that the overall operations there involved constituted reworking. The issue was whether the "reworking operations", including preparatory operations such as work on roads, repair of flow lines, placing of necessary equipment on the wellsite, etc., began within the time period specified in the two leases being interpreted. Only in Harry Bourg Corporation v. Union Producing Co., 197 So.2d 172 (La.App.1st Cir., 1967), was the same issue as that here presented, faced by our brothers of the First Circuit Court of Appeal. Viewing the nature of the operations in that case, which resulted in the plugging back and recompletion of a previously producing well at a higher level, it is undeniable that such operations are reworking of a well. In the case presently under consideration, however, the overall operations relied upon by defendant cannot be viewed as reworking as they did not affect the ability of the stratum or horizon to produce into the well bore. As we see it, these operations *626 were of a kind looking toward the resumption of production, and while the defendant lessee may have contemplated the possibility of reworking the well and may, in fact, have been in good faith in such contemplation, the operations do not constitute reworking of the well and thus do not satisfy the requirements of the lease.
In short, it is obvious that with the exception of the Harry Bourg case, no definition has ever been mentioned or cited from testimony in a record. In the Harry Bourg case, the court did not adopt any definition for its own use, but the one given by the experts, this court believes, is not adverse to the testimony here. So that the definition previously giventhat is, that reworking constitutes an effect on the strata or horizon's ability to produce into the well bore, rather than the ability of the well bore itself to produce, is the proper definition to be given to the term reworking.
Further evidence of error in the reasoning of the majority is revealed in the fact that they attempt to "affirm" the decision of the lower court in ruling that this was reworking. It is to be noted, however, that the lower court did not determine that this was actually reworking, but rather ruled that, "The evidence favors the conclusion that Waterbury intended reworking operations if they were indicated. * * *" (Emphasis supplied.)
In summary, it is the opinion of this writer that not wanting to do so, the majority has formulated a definition of reworkinga definition which is so vague, that the possibility of its being relitigated is felt to be obvious. It is the duty of a court to settle matters being litigated between parties, but as well every court should attempt to stifle further litigation of the same issues, by clearly and positively stating the reasons and authorities for its decision. This writer simply feels the majority's opinion falls short of accomplishing this purpose.
For the foregoing reasons, it is the opinion of this writer that the lower court's decision should be overruled and judgment be awarded in favor of plaintiff-appellants-lessors canceling the leases as prayed for.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., dissents and will assign written reasons. FRUGÉ, J., votes for rehearing.

On Application for Rehearing
TATE, Judge (dissenting from denial).
The writer respectfully dissents from the denial of rehearing.
In my opinion, my brother Fruge is correct that the operations here in question were not of the nature contemplated by the defendant's lease as sufficient to prevent the expiration of a non-producing mineral lease. Further, it seems to me, as it did to him, that the majority's disposition of this issue leaves the law in an unsettled state which will breed litigation. We should and could avoid this situation by facing up to the legal essentials of what does constitute reworking operations, rather than translating this issue of law into an issue of fact variously resolvable in the future, depending on the indefinable individual equities of the controversies to arise, and upon the case-by-case resolution of the swearing matches between the numerous experts to be hired to testify.
In this latter regard: While we cannot weigh the value of expert opinion in terms of numbers, nevertheless in this case three of the five experts who testified were of the opinion that the operations conducted by the defendant were not "reworking operations", as that term is accepted in the industry and in their experience. Their opinion reflects what I believe to be a common sense observation of a non-expert: That the use of a wire line and paraffin knives is an operation of the kind falling within the category of routine maintenance *627 operations conducted in innumerable wells in this and other states:
The majority's emphasis on the "success" of defendant's operations seems to find significance in what is legally irrelevant. Many routine maintenance operations might be successful in restoring production, yet we cannot hold that all such operations are "reworking" operations, such as will indefinitely hold a non-producing lease from expiration.
Further, that the defendant may have been in good faith in going on the lease premises and conducting the operations in which he engaged is also legally irrelevant. Even admitting that the defendant was in the utmost good faith in conducting`these operations, the question for decision is whether these operations met the requirements of the lease. In this instance, they did not. The equitable appeal of this defendant's seriousness and good faith, although legally irrelevant, may have led my brothers of the majority astray.
Before looking at the requirements of this lease, it is well to note, as did my brother dissenter, that only one of the cases cited and relied upon by the majority deals with the actual question before us for decision.
In both Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 and Johnson v. Houston Oil Co. of Texas, 229 La. 446, 86 So.2d 97, no issue was made as to whether the operations there in question were "reworking operations." The question was whether the admitted reworking operations there involved began within the period provided in the leases in question.
However, in Harry Bourg Corp. v. Union Producing Co., La.App.1st Cir., 197 So.2d 172, the issue presented by this case was considered. But the conducting of operations there (consisting of plugging back and recompletion of a previously producing well at a higher level) undoubtedly constitute reworking operations. By contrast, the case now before us for decision presents one of those borderline maintenance-vs-reworking situations which require the establishment of definition in the law.
As in any case involving the construction of a contract, it is necessary to look to the contract itself and to determine as near as may be the intent of the parties. LSA-C.C. Art. 1945. The pertinent portion of the lease before us for interpretation is as follows:
"It is provided, however, that if, after the discovery of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause, this lease shall terminate unless lessee resumes or restores such production, or commences additional drilling, reworking or mining operations within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of reworking operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals. * * *" (Emphasis added.)
In my opinion, defendant's operations did not meet the requirements of this lease.
First, it is observable that the lease requires that the lessee resume or restore production OR commence additional drilling, reworking, or mining operations within the ninety (90) day period. Examining the normal meaning of these words, it seems to me that the parties contemplated that there might be attempts to restore production falling short of reworking operations. This is emphasized by the fact that the term "additional" in my opinion is intended to modify all three words in the series"drilling," "reworking," and "mining."
Thus it is my opinion that operations of a routine nature intended to "resume or restore" production must actually resume *628 or restore production within the ninety (90) day period or the lease will expire.
I note here additionally the alternative usage of "resume or restore." The former to me indicates a situation in which it is within the will of the lessee to resume production which has ceased for reasons other than the ability of the well to produce. The latter contemplates situations in which some operation is necessary for "restoration" of production, and in which restoration may or may not be possible for technical reasons.
I consider that the operations conducted by the defendant in this case were of the routine kind which should be characterized as an attempt to "restore" production within the meaning of the lease. As production was not restored within the ninety (90) day period, it is my opinion that the lease expired.
In a borderline case of this kind, a line must be drawn between operations directed toward restoring production, on the one hand, and "reworking operations", on the other. The term "reworking operations" as used in this lease is ambiguous in the light of the facts of this case.
Thus, in drawing this line, we should apply the accepted principle, particularly applicable to oil and gas leases, that where there is ambiguity in an instrument, the party who wrote or selected the form of the instrument should have any such ambiguity resolved against him. LSA-C.C. Arts. 1957, 1958. Because of the superior bargaining power of most oil and gas lessees, and because of the normal practice according to which lessees present printed forms to lessors for execution, this rule is especially pertinent with regard to oil and gas leases.
If there is ambiguity as to whether the operations conducted by the defendant constitute reworking operations, certainly doubts should be resolved in favor of plaintiff. Three reputable experts testified in this case that the term "reworking" operations, as they generally understood the term "reworking" operations, means operations affecting the ability of the producing formation or horizon to feed into the well bore. It seems to me that this is a reasonable and workable definition of the term as used in this particular lease, regardless whether the lease be considered ambiguous. In my opinion, the majority is in error in holding that defendant's operations constituted reworking operations, as they did not affect the ability of the formation to feed into the well bore but only the ability of gases or fluids to flow through the tubing.
Among the operations which should properly be considered reworking operations are: reperforation, acidizing, squeeze cementing, sand consolidation, fracing, or other similar operations affecting the ability of the formation to feed into the well bore. Using a wire line and scraper does not fall within this category. It is, as testified to by plaintiff's experts, an operation which can be handled with minimal supervision and which is a maintenance-type operation. In construing this lease, this latter is a type of operation which I believe the contract contemplates as an attempt to "restore" production.
To maintain the lease, paying production would have had to be restored within ninety days of cessation. Such was not the case, and the lease should be held to have expired. In reaching this conclusion, I emphasize that I am aware of and impressed by the seriousness and the good faith of the defendant in conducting these operations. However, I feel that it is one of those unfortunate situations in which a lessee has not met the terms of the agreement which he undertook to perform. If in the future lessees wish to contract for a different interpretation of this term, drafting solutions may be provided.
For these reasons, the decision of the lower court should be overruled and judgment should be rendered in favor of appellants.
NOTES
[1] More detail as to the testimony of plaintiffs' expert witnesses is as follows: Mr. Ben H. Freeman, a petroleum engineer with experience in the industry since 1940, testified:

Q. Mr. Freeman, in your opinion, what constitutes a re-working or work over operation?
A. As I understand it, a work over operation is doing work on a well that has produced, which work affects the reservoir from which your production comes or from moving in work over equipment to do mechanical work on the well.
Q. Mr. Freeman, you have heard the testimony of Mr. Waterbury, and Mr. Thistlethwaite relating to the operations that were conducted with reference to the Waterbury well which is now in controversy, and I ask you, in your opinion, would you consider those operations as a work over or re-work operation?
A. No.
Q. To be more specific, do you consider the running of a paraffin scraper on a wire line unit into a well as a work over or re-working operation?
A. No, sir, I feel that any thing that can be handled by the pumper in the field who is at the well each day is production maintenance. That would include changing charts, changing chokes on wells, keeping his production records, keeping the tubing clean, tanks clean, anything minor that the pumper can take care of without supervision other than the pumper is simply production maintenance, you are maintaining production on those wells.
Q. In other words, in your opinion, the mere running of a scraper on a wire line unit is something that can be supervised by a gauger and therefore is a maintenance operation?
A. Yes.
Mr. Richard Steinhorst, Jr., also a petroleum engineer with practical experience since 1942, testified:
Q. Now, Mr. Steinhorst, would you please define for the Court your understanding of a work over or re-working operations, if you find those two words synonymous?
A. They are synonymous. We consider those types of operationsany operation which affects the ability of the producing formation to feed into the well bore. * * *
Q. Now, what type of operations may become necessary to affect the producing horizon?
A. Well, first and basically of course, if the well is cased, would be perforating or putting holes in the casing.
Q. That's your initial?
A. That would be initial, yes, sir.
Q. And you would consider that initial perforation at the producing horizon to be a re-working operation or work over operation?
A. A re-perforation of the same area would be a work over operation.
Q. And what else, that would be number one?
A. There would be acidizing, squeeze cementing, various types of well stimulation, operations to control water production, or to control excessive gas oil ratio, and any other operation which actually affects the ability of the well to feed in.
Mr. Paul Montgomery, a petroleum engineer with experience since 1941, stated:
Q. Now, Mr. Montgomery, would you define for the Court your understanding of what a re-working operation or work over is?
A. I would say that a work over operation is an operation that is planned to affect the producing characteristics of the well, the ability of the well to produce hydrocarbons.
* * * * *
Q. What type of activities or operations are there in the petroleum industry which could affect the production ability of a well?
A. Perforating, squeeze cementing, sand consolidation, fracing, various squeeze operations other than cement, that is squeezing oil for instance, all of these could affect the producing characteristics of the formation.
* * * * *
Q. Now, after hearing all of the facts of this case as testified to by Mr. Waterbury and Mr. Thestlethwaite, yesterday, do you consider the operations performed by them on the Robert L. Waterbury well a work over or a re-working operation?
A. No, sir.
Q. Why, Mr. Montgomery?
A. What they did actually was to go into the hole with a paraffin scraper and remove what in my opinion was an obstruction in the tubing. They did not do anything that had any bearing on the productive capacity of the well, that is the ability of the well to produce into the well bore hydrocarbons, salt water or whatever. Actually what they did was a mechanical operation, that is, a part of normal housekeeping in a well that does have a paraffin problem.
[2] Williams and Meyers, Oil and Gas Law-Manual of Oil & Gas Terms, at page 338, defines "reworking operations" in a manner very similar to the testimony of the three experts in the Harry Bourg Corporation v. Union Producing Company case, supra, as follows:

"Work performed on a well after its completion, in an effort to secure production where there has been none, restore production that has ceased or increase production. Cleaning out a hole that has silted up is a typical reworking operation. In Rogers v. Osborn, 152 Tex. 540, 261 S.W. 2d 311, 2 O & G. R. 304, 1439 (1953), the trial court defined reworking operations as follows: `"re-working operations" * * * means actual work as operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operation would do in the same or similar circumstances.' The appellate court neither approved nor disapproved of this definition. In the same case, the court held that periodic flowing (q.v.) or bleeding a well could amount to reworking operations, where the jury so found. See also Johnson v. Houston Oil Co. [229 La. 446], 86 So.2d 97, 5 O. & G. R. 1169 (La.1956).
"The legal definition of the term is important because many leases contain clauses such as or similar to the following:
"If prior to discovery of oil or gas on the land lessee should drill a dry hole thereon, or if after discovery of oil or gas the production thereof should cease, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty days thereafter * * * If at the expiration of the primary term, oil, gas or other mineral is not being produced on the last but lessee is then engaged in drilling or reworking operations thereon, this lease shall remain in force so long as such operations are prosecuted with no cessation of more than thirty days * * *'
"The term `reworking' is defined in one agreement form as `all operations designed to secure, restore or improve production through some use of a hole previously drilled, including, but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, plugging back to test higher strata, etc." Myers, The Law of Pooling and Unitization 475 (1957). See Cleaning a well, Redrilling, Workovers."
[3] The production reports show, for instance, that during January, 1961, the well produced 991,000 cubic feet of gas and 920 barrels of oil, for a gas-oil ratio of 1077 cubic feet of gas to each barrel of oil, which is less than the 2,000 to 1 ratio established by general orders of the Conservation Department for a gas well. Each of the nine months in question the ratio fell below 2,000 to 1.