294 So.2d 810 (1974)
SCURLOCK OIL COMPANY
v.
GETTY OIL COMPANY et al.
LOUISIANA INTRASTATE GAS CORPORATION
v.
Robert L. WATERBURY et al.
Nos. 53795-53797.
Supreme Court of Louisiana.
April 29, 1974.
Rehearing Denied June 7, 1974.
*811 Lucius F. Suthon, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants-applicants in 53797, and plaintiffs-respondents in 53795 and 53796.
Duncan M. Smith, Jr., Lafayette, Carl W. Cleveland, C. Ellis Henican, Henican, James & Cleveland, New Orleans, for plaintiffs-respondents in 53797, and defendants-applicants in 53795 and 53796.
*812 SUMMERS, Justice.
Two concursus proceedings are involved here. Scurlock Oil Company instituted the proceeding to determine entitlement to funds representing purchases of oil, while Louisiana Intrastate Gas Corporation seeks by concursus to ascertain whom it should pay for gas purchased from the same productive units. The competing and conflicting claims to these funds arise from the fact that certain owners of lands included in these producing units granted leases affecting these lands and later leased the same lands to another. The object of this concursus is to determine and settle the claims of the parties asserting rights under these leases. This is the second time the validity of these leases has been litigated.
These are the facts which present the problems: On July 29, 1954 Burice C. Bihm, as lessor, executed an oil, gas and mineral lease in favor of F. J. Muller, as lessee, applying to and affecting six acres of land in St. Landry Parish, Louisiana. On the next day, July 30, 1954, Adler V. LeDoux and James Pitre, as lessors, executed an oil, gas and mineral lease also in favor of F. J. Muller, as lessee, applying to and affecting 152 acres, adjacent to the six-acre tract leased from Bihm. These leases were for primary terms of five years and provided that they could be maintained in effect beyond the primary terms by operations and production in accordance with other lease terms and conditions. Muller assigned the leases to Tidewater Oil Company (now Getty Oil Company).
Effective March 1, 1959 the Commissioner of Conservation created a drilling unit known as the "Cockfield No. 2 Sand Unit No. 21-2". This unit, consisting of 320 acres, included portions of the lands leased to Muller by the above leases. The unit applied only to the Cockfield No. 2 Sand, a gas sand defined in the Commissioner's order as that gas-condensate bearing sand encountered between 10,376 feet and 10,410 feet in the Tidewater Oil Company-Jeanne R. Haas Well No. 1 located in Section 10, Township 6 South, Range 5 East.
Early in 1960 Tidewater completed a well in the Cockfield No. 2 Sand within the boundaries of the Cockfield No. 2 Sand Unit No. 21-2 on the lands of Robert L. Waterbury. The well, known as Tidewater-Waterbury #1, produced until August 6, 1960, at which time production ceased. Robert L. Waterbury then acquired the right, and did undertake, to restore production from the well. Accordingly, he began reworking operations and successfully restored production in November 1960.
Apparently believing that the acreage outside the unit boundaries was no longer of value, Tidewater, by instrument duly acknowledged on June 5, 1961, released the mineral leases insofar as the acreage outside the unit was concerned, retaining its rights to the acreage inside the unit. Shortly thereafter, on June 23, 1961, the landowners granted two oil, gas and mineral leases to Vernon J. Main affecting the identical property which was the subject of the Muller leases. The leases to Main affected the acreage inside and outside the unit; they affected the lands which Tidewater retained and that which it had released on June 5, 1961. By subsequent transfers these leases to Main were acquired by R. L. Bauman, Jon Rogers, Bauman Trust Estate, Michael Collins Bauman Trust Estate, Jim Braden, Mrs. Mildred Bollman, Donald S. Bollman, Vernon J. Main, Jr., and Mrs. Betty Jane Garber Ellis. All parties acquiring rights from the Main leases we shall refer to as the Bauman Group.
Tidewater then transferred its retained rights in these leases to Aladdin Oil Company, Inc., on November 20, 1961. This document, referred to as a "Partial Assignment of Oil, Gas and Mineral Leases" purported to "grant, bargain, sell and assign unto Aladdin Oil Company, Inc., all of its (Tidewater's) right, title and interest" in the leases. However, the transfer only related *813 to the land within the unit and "INSOFAR AND ONLY INSOFAR as said leases cover and affect the Cockfield No. 2 Sand ...." By virtue of subsequent transfers from Aladdin, in which it retained overriding royalty, William L. Waterbury became the owner of the leases in sofar as they covered property within the unit and insofar as the leases affected the Cockfield No. 2 Sand. He, in turn, also retaining overriding royalty, assigned the leases to Robert L. Waterbury. In time Aladdin transferred interests to John F. Fitzhugh, Frank G. Weiner and Indger Properties, Inc. All of these parties, including Robert L. Waterbury, deriving interest from the Muller-Tidewater leases we shall refer to as the Waterbury Group.
By virtue of an order of the Commissioner of Conservation subsequent reformation of units involving the Cockfield No. 2 Sand resulted in the establishment of three units involving all or parts of the 158 acres leased to Muller and later leased to Main. The funds in concursus are derived from production from these units.
The owners of the lands affected by these leases instituted suit on September 6, 1962 against Tidewater, Robert L. Waterbury and Aladdin Oil Company, Inc., seeking a judicial cancellation of the Muller lease then held by Waterbury. The suit was based upon the contentions that: 1) royalties were not timely paid; 2) production from the unit well in question could not be attributed to the Waterbury leases because the unit was a gas unit and produced only oil; 3) the termination of the prior unit cut off production attributable to the leases and terminated them; and 4) a lease provision required that after cessation of production the lease would terminate "unless Lessee resumes or restores such production, or commences additional reworking or mining operations within ninety (90) days." Principally the contention was that there was no restoration of production or commencement or reworking operations during the ninety-day period following the cessation of production on August 6, 1960.
On June 13, 1963 attorneys for the landowners wrote to Tidewater referring to the pending suit. The letter proposed: "In consideration of your payment of $2,750.00 to the undersigned attorneys for the plaintiffs in the above-captioned case and a release of your retained rights in the oil, gas and mineral leases involved in the said case, we do hereby agree ..." that in the event a judgment is awarded in favor of the plaintiffs no attorneys' fees would be collected against Tidewater. Within a month thereafter, on July 12, 1963, Tidewater executed a document in which it did "release, relinquish and quitclaim all of its right, title and interest in and to" the oil, gas and mineral leases acquired by Muller in July 1954. (This document was not recorded until May 7, 1968, after judgment denying cancellation of the lease.)
The suit for cancellation of the leases proceeded to trial on September 16, 1964. Judgment was rendered in the trial court on March 6, 1968 in favor of the defendants, dismissing the suit and upholding the validity of the leases. The landowner-lessors appealed the judgment to the Court of Appeal, Third Circuit, and on January 29, 1969 that court rendered its opinion affirming the trial court judgment upholding the leases. House v. Tidewater Oil Company, 219 So.2d 616 (La.App.1969). (The entire record of these proceedings was introduced as evidence at the trial in the instant concursus proceedings.) We denied certiorari on April 25, 1969. 253 La. 1081, 221 So.2d 516.
Meanwhile, as already noted, production was restored in the Tidewater-Waterbury Well No. 1 in November 1960, the lands affected by the leases to Muller being part of this unit. Louisiana Intrastate Gas Company, as the purchaser of gas from this unit and from subsequently formed units involving these same lands, and Scurlock Oil Company, as the purchaser of oil from these units, held the money due for *814 this production in suspense pending a final judgment in the lease cancellation suit. When that suit was resolved, however, the Bauman Group advised Louisiana Intrastate Gas Corporation and Scurlock Oil Company that they considered the November 20, 1961 transfer by Tidewater to Aladdin to be a sublease and not a partial assignment as it purported to be. Thus, according to the Bauman Group, the July 12, 1963 release by Tidewater had the effect of releasing not only the retained interest of Tidewater in the leases, but also all other rights under the leases, including those previously transferred by Tidewater to Aladdin as sublessee. The Waterbury Group, on the other hand, were contending that their lease was in full force and effect and they were entitled to the funds held in suspense by the purchaser of production.
Confronted with these conflicting claims, Louisiana Intrastate Gas and Scurlock instituted these separate concursus proceedings, citing the Waterbury Group and the Bauman Group to assert their respective claims to the disputed funds.
Motions for summary judgment and exceptions of res judicata were filed by Robert L. Waterbury and John F. Fitzhugh, Frank G. Weiner, Indger Properties, Inc., and Aladdin Exploration Co., Inc., in support of their claim to the validity of the leases and the disputed funds. Tidewater (Getty Oil Co.) asserted its claim to $21,139.98 expended by it as operator of the fieldwide unit in which the disputed acreage is located, that amount being the proportionate share of costs attributable to the disputed acreage. The Bauman Group are contending they are entitled to recoupment of drilling, completing and operating costs for the well they caused to be drilled on a unit in which part of the disputed acreage is located.
The trial judge sustained the exceptions of res judicata and granted the motions for summary judgment. The judgment of the trial judge also ordered that claims of the parties for reimbursement of drilling costs, developments costs, operating costs or other well costs were to be relegated to further proceedings, and pending this determination the funds in custodia legis were not to be disbursed except on order of court.
On appeal to the Third Circuit the judgment was reversed. Summary judgment was granted in favor of the Bauman Group. Otherwise, the judgment reserving the rights of the parties to a determination of cost allocation was approved and the case was remanded for that purpose. In the opinion of the Court of Appeal the exceptions of res judicata were not well grounded, and the motions for summary judgment in favor of the Waterbury Group should not have been granted. 278 So.2d 851.
Separate applications for review were filed by the Waterbury Group. We granted writs. 282 So.2d 521.
The basic controversy revolves around the validity of the leases from which the Waterbury Group derive their rights. If these leases are valid, the Waterbury Group is entitled to the funds on deposit in the registry of court. Under these circumstances the Main lease, from which the Bauman Group derives its rights, must be considered a top lease; it can have no effect, therefore, during the life of the Waterbury lease. Conversely, should the Bauman Group succeed in its effort to have the Waterbury lease declared invalid, the Main lease becomes effective, and those deriving their rights from that lease are entitled to the fund in concursus.
Four issues are presented by the facts and circumstances of these concursus suits:
1) Before other issues can be reached the exceptions of res judicata filed by the Waterbury Group must be resolved. It must be found that the Bauman Group has a right to litigate the validity of the Waterbury leases again, despite its unsuccessful attempt to have these leases declared invalid in House v. Tidewater Oil Co., 219 So.2d 616 (La.App.1969).
*815 2) Tidewater's transfer to Aladdin of November 20, 1961 presents the question whether that transaction is a sublease or assignment.
3) The effect of the release executed by Tidewater on July 12, 1963.
4) Was it proper for the Court of Appeal to grant summary judgment to the Bauman Group when they did not move for summary judgment.

Res Judicata
The first issue, based upon the exception of res judicata filed by the Waterbury Group, calls for a decision whether the instant action is barred by the litigation in House v. Tidewater Oil Company, 219 So. 2d 616 (La.App.1969), cert. denied, 253 La. 1081, 221 So.2d 516. There, when this court refused writs, the judgment became final. That case was then a thing adjudged. La.Civil Code art. 3556(31).
The principle of res judicata in Louisiana is stated in Article 2286 of the Civil Code:
"The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality."
By the very terms of Article 2286 in order for res judicata to apply there must be identity of the "thing demanded", the "cause of action", and the "parties" in the "same quality" in both lawsuits.
Identity of parties is demonstrated by the fact that in the House Case the plaintiffs were the landowners; defendants were the Waterbury Group who were parties claiming rights derived from the July 1954 leases to Muller. The Waterbury Group are, therefore, obviously the "same parties" in the "same quality". In the case at bar the same parties are again defending the validity of the same July 1954 leases from which they derive their alleged rights.
Similarly the parties contesting the validity of the lease are the same. The Bauman Group derive their alleged rights from the landowners by virtue of an oil and gas lease. Though not actually the "same parties" as the plaintiffs in the House Case, they derive their rights from them. The Bauman Group is acting in the "same quality" which characterized the position of the plaintiff landowners in the House Case they are seeking to have the lease from which the Waterbury Group derives its rights declared invalid, cancelled and terminated.
It is not necessary that the Bauman Group be made up of the identical persons as the landowner-lessors who were plaintiffs in the House Case; they are the successors and assigns or privies of the landowner-lessors, asserting rights derived from the landowner-lessors, and, as such, they are the "same parties" in legal contemplation within the intendment of Article 2286. Quinette v. Delhommer, 247 La. 1121, 176 So.2d 399 (1965); California Co. v. Price, 234 La. 338, 99 So.2d 743 (1957); 1 Pothier On Obligations (3d ed. 1853, Translation by William David Evans) Article V [53], p. 588.
No doubt the "thing demanded" is identical. Each suit seeks cancellation and termination of the identical leases obtained by Muller from the landowners in July 1954; nor do we feel there can be any doubt that "the object of the judgment" is the same. Each suit seeks a decree declaring the same leases to be invalid and ordering their cancellation. The ultimate object of each suit is to obtain the funds on deposit derived from production attributable to the same properties.
If the predecessors of the Bauman Group had succeeded in the House Case, they would have been entitled to the funds held *816 in suspense. The same result will obtain if their successors succeed in their contentions in this concursus proceeding. On the other hand, when the Waterbury Group succeeded in the House Case they were entitled to the fund on deposit, but they were denied the relief by the predecessors of the Bauman Group asserting the claims and contentions which provoked this concursus proceeding. The Waterbury Group must again succeed here before they will be entitled to the funds in suspense which are on deposit in the registry of Court and which they were entitled to receive after the decision in the House Case.
It is unimportant that the House Case involved a suit for cancellation of the oil and gas lease contract for failure to comply with its provisions; and that this is a concursus proceeding the procedure employed being different in the two cases. The form of procedure is immaterial if the proper parties join issue upon questions, either of law or fact, before a competent court. Norah v. Crawford, 218 La. 433, 49 So.2d 751 (1950), and the many cases cited there. See also Brady v. Parish of Ascension, 26 La.Ann. 320 (1874); Trescott v. Lewis, 12 La.Ann. 197 (1857); Johnson v. Lemons, 157 So.2d 752 (La.App.1963).
Despite the "identities" referred to above, it is our opinion that a vital identity does not exist in this case for the claims asserted in this concursus proceeding do not involve the "same cause of action". The theory of the claim asserted by the Bauman Group is that the November 20, 1961 transfer of the lease from Tidewater to Aladdin was a sublease, not an assignment as it purports to be. Thus, Aladdin and the other members of the Waterbury Group who derived their rights from this sublease held these rights subject to the rights of their sublessor Tidewater. According to the Bauman Group contention, therefore, when Tidewater quitclaimed and released its rights in the leases which it obtained from Muller it also quitclaimed and released the rights of its sublessee.
On the other hand, the Bauman Group concedes that if the instrument whereby Tidewater transferred lease rights to Aladdin was an assignment, Tidewater had no right thereafter, either by quitclaim, release or otherwise, to affect the rights of the Waterbury Group who derived their rights from the assignment to Aladdin. The distinction is that in the case of an assignment the transferor retains no interest in the lease rights assigned, whereas in a sublease the sublessee has no more rights than his sublessor. Under this theory, if a sublessor quitclaims or releases his rights to the lease, the sublessee's rights are also lost, while a lessee who assigns part of a lease may lose his rights in that part he has retained without affecting the rights of his assignee.
With these propositions upon which the Bauman Group rely before us, it becomes readily apparent that since their predecessors (the landowner-lessors) from whom they derive their rights were unsuccessful in the House Case, if the character of the transfer from Tidewater to Aladdin as an assignment or sublease was at issue there, either expressly or by implication, the cause of action here is the same, and res judicata applies. That issue, whether correctly or incorrectly resolved there, either directly or by implication, cannot be relitigated here; for it is implicit in the position of the Bauman Group in the case at bar that if Tidewater transferred the lease to Aladdin by assignment and not by sublease, the Bauman Group cannot contend that Tidewater could "release" the lease in which the Waterbury Group claims an interest.
Our attention is called to the fact that in our review of the record in the House Case we will find the issue of sublease and/or assignment was alleged as follows:
"By an instrument dated November 20, 1961, recorded under Entry No. 459459 in Lease Book 245, Page 219, of the records of the Office of the Clerk of Court in and for the parish of St. Landry, *817 Louisiana, Tidewater Oil Company subleased and/or assigned unto Aladdin Oil Company, Inc., all of its retained rights in and to the oil, gas and mineral leases hereinabove described ...."
Though urged by the Waterbury group in support of their position that the issue was litigated there, we find this allegation to be a mere recital of the factual sequence of eventsnot the assertion of an issue.
The document of November 20, 1961 evidencing the transfer from Tidewater to Aladdin was also offered in evidence. This too had no bearing upon the issue before the Court except to support the narrative of facts leading to the contested issue.
The assignment of the July 1954 leases from Muller to Tidewater is mentioned in the reasons for judgment of the trial judge, the reasons stating: "By subsequent assignments, Robert L. Waterbury came to be owner of the leases ...." (emphasis added). Again this language was not intended to resolve the character of the transaction, but merely to show the transition of rights to Waterbury.
In its brief to the Court of Appeal the Waterbury Group argued:
"2. Robert L. Waterbury Acquired the Leases in Question by Assignment and Not by Sublease.
"Appellants have argued that Robert L. Waterbury acquired the leases in question by `sublease' as opposed to `assignment'. This is not an issue in this case. However, the contention is patently erroneous, and the trial court recognized that Mr. Waterbury had acquired the leases by successive assignments. (Reasons for Judgment. Tr. 40). See Robertson [Roberson] v. Pioneer Gas Co. [173 La. 313], 137 So. 46. The assignments by which Mr. Waterbury acquired the leases are absolute (Exhibit P-8, Tr. 209-212). There are no limitations on the assignee's rights with respect to the sand here involved and the assignee can exercise all rights with respect to that sand without any obligations on the part of the assignee to Tidewater. Tidewater sold its rights to the Cockfield No. 2 Sand to Aladdin. It did not simply lease the sand. See also Mire v. Sunray DX Oil Company, 285 F.Supp. 885 (W.D.La.1968) and the many authorities there cited ...." (emphasis added).
As the emphasized language in the quotation concedes, the character to the purported assignment was not at issue.
In its decision affirming the trial court the opinion of the Third Circuit set forth:
"We attach particular significance to the following facts: The well had actually ceased to produce and had been abandoned by the original operator, Tidewater. Mr. Waterbury purchased the leases from Tidewater and, as a new operator, commenced efforts to restore the well to production." (emphasis added). House v. Tidewater Oil Co., 219 So.2d 616, 623 (La.App.1969).
Once more this very casual reference to the Tidewater transfer to Waterbury was not intended to resolve the very complex issue of whether the transaction was an assignment or sublease.
In its application to this Court for review of the Court of Appeal decision in the House Case, the Bauman Group referred to Aladdin as "sublessee from Tidewater, and Robert L. Waterbury, the sublessee from Aladdin ...." Apparently they then realized that the issue of assignment or sublease assumed a role of paramount importance to their position.
There are many views expressed by the commentators and in our decisions on the meaning of "cause of action" as used in Article 2286. See Comment, 2 La.L.Rev. 347 (1940); Comment, 2 La.L.Rev. 491 (1940). Under one view expressed by French authorities, the validity of an instrument is a single cause; and the vices of consent, form, incapacities, etc., which will establish invalidity, are merely means. *818 Therefore an attack upon the instrument on the ground that it was forged will bar a subsequent attack based upon the assertion that it was secured by fraud or violence, or that the person who signed was insane or was a minor. This position is taken by Griolet and Bonnier. Griolet, Del `Autorite de la Jugee (1868) 109-113.
Another view holds that the various grounds of invalidity should be grouped into vices of consent, vices of form, the incapacities, etc.; each of these groups constitutes a cause, the separate vices within each category (as fraud, error, duress) constituting mere means. Thus, under this view, an attack on the ground of fraud would preclude a subsequent attack on the ground of error or duress, for these merely tend to prove the same proximate cause, i. e., nullity for vices of consent, but it would not prevent an attack on the ground of insanity, which tends to substantiate a different proximate cause, i. e., nullity for incapacity.
Still another view held by some is that each of the vices is a separate cause, and therefore failure of the plaintiff in an attack on the ground of fraud will not bar a subsequent attack on the ground of error or duress, or other vice. This latter view has been adopted by practically all the modern commentators. See 2 La.L.Rev. 356-58.
In Louisiana res judicata is stricti juris, and the second suit should not be barred when there is any doubt of the applicability of Article 2286. The judgment has the authority of the thing adjudged only as to matters put in issue by the pleadings and actually decided by the court.
In three types of cases, however, the judgment is conclusive not only of the matters raised and decided in the suit, but also of all matters which might have been pleaded therein. This is true only when the first suit was a (1) petitory action; (2) partition suit, or (3) suit for injunction against the execution of a judgment or a sale under executory process; but the judgment is not conclusive of grounds for injunction which are matters of public policy, and which were not urged in the first suit. 2 La.L.Rev. 524-25.
In support of this summary of the Louisiana law on res judicata the following authority is pertinent:
"The exception of the thing adjudged is stricti juris, and if there should be doubt as to the identity of the thing claimed or of the persons claiming them, it cannot be maintained." West v. His Creditors, 3 La.Ann. 529 (1848)
"The plea of res adjudicata is not tenable. To sustain that plea there must be an identity of parties, of capacity, of object, and of cause of action. One of these at least is lacking here." Collens v. Jumel, Auditor, 30 La.Ann. 861 (1878)
"It is elementary, that to constitute res judicata, the thing demanded must be the same and the demand must be founded on the same cause of action." Huyghe v. Brinkman, 34 La.Ann. 1179 (1882)
The formula for judging a plea of res judicata announced in Article 2286 of the Civil Code was borrowed by the redactors of our Code from the Code Napoleon (Article 1351); by the Code Napoleon from Pothier, Obligations, No. 889; and by Pothier from the Roman Jurisconsults. The article brings out with commendable clarity the salient features of the law, requiring identity as to the thing demanded, cause of action, and persons in the two suits. State v. American Sugar Refining Co., 108 La. 603, 32 So. 965 (1902).
In 1902 when Mr. Justice Provosty authored the opinion in State v. American Sugar Refining Co. he could declare with authority that in deciding the question of res judicata, "Our court has never wavered, that we know of, in the rigid exaction of the three unities." If our decisions have not always adhered to the doctrine of strict construction since in applying res judicata, *819 our considered judgment is that strict construction is required by the Code. The doctrine is moreover compatible with the principle that freedom of access to the courts is guaranteed by Louisiana's Constitution. "All courts shall be open, and every person for the injury done him in his rights, lands, goods, person or reputation shall have adequate remedy by due process of law and justice administered without denial ...." La.Const. Art. I, ¶ 6. This interest outweighs the argument that litigation should have an end. Cf. Laurent, Principles de Droit Civil Francais (2d ed. 1866) 55, n° 39.
Upon these principles we cannot say that res judicata applies in this case to bar a suit seeking cancellation of a lease on grounds entirely different from and based upon a distinctly different cause of action, not made an issue in the prior suit and not adjudged there. None of the issues presented in the case at bar which we have referred to were adjudicated in House v. Tidewater.

Assignment or Sublease
The question whether horizontal segregation of a mineral lease is an assignment or a sublease is undoubtedly of considerable interest to those concerned with such matters. However, we need not reach that question. This controversy can be resolved by our interpretation of the release at issue.

The Effect of the Tidewater Release
The Bauman group urge that when Tidewater released its rights in the leases under which the Aladdin-Waterbury group were operating it also released the rights of its sublessee Aladdin. Their contention is that the sublessee had no rights except those it derived from the sublessor Tidewater, and when Tidewater granted the release, the rights of the Waterbury group were relinquished also. In effect, the Bauman group is saying that Tidewater with full knowledge of the valuable rights the Waterbury group had acquired, and by which they were maintaining the lease in full force and effect, deliberately released and relinquished its rights and the rights of its assignee or sublessee. The contention requires close scrutiny of the facts and circumstances surrounding the release, for if Tidewater did in fact intend such a result its action was irrational.
Under the terms of the leases it held, Tidewater was granted the right to assign its rights in whole or in part. The pertinent lease provision reads: "... this lease may be assigned, in whole or in part, either as to any interest therein or any portion of the premises ...." Based upon this contractual right Tidewater assigned or subleased to Aladdin the rights asserted by the Waterbury group.
The letter agreement to which reference has been made was a prelude to the execution of the release by Tidewater and is evidence of what the parties contemplated by the formal instrument. As it is pertinent to this issue, the letter reads:
"In consideration of your payment of $2,750.00 to the undersigned attorneys for the plaintiffs in the above captioned case and the release of your retained rights in the oil, gas and mineral leases involved in the said case, we do hereby agree that in the event a judgment is awarded in favor of the plaintiff and attorney's fees are granted, then we will enforce collection of one-third of the total of any attorney's fees awarded against Aladdin Oil Company and one-third of said fees against Robert L. Waterbury."
It is implicit in this letter agreement that Tidewater had previously divested itself of certain rights in the leases and had retained others. It was these retained rights which were to be the subject of the release not the rights which Tidewater had conveyed to others. These latter rights were to be unaffected by the contemplated releasethey were to be undisturbed by it.
*820 Thus, when Tidewater executed the instrument whereby it did "release, relinquish and quitclaim all of its rights, title and interest in and to the" leases, it intended, in accordance with its agreement with the attorneys for the landowner, to release its retained rights. The retained rights were those which it had not conveyed to Aladdin and the Waterbury group. This agreement to release only retained rights had been arrived at with the landowners, the predecessors in interest of the Bauman group and the parties from whom the Bauman group obtained their rights. Notwithstanding, at this time the Bauman group as the successors of the landowners are taking a position diametrically opposed to the latter agreement.
It is not what Tidewater could have done at the time of the release, for, if the purported assignment to Aladdin was in fact a sublease, Tidewater was undoubtedly in a position to relinquish those rights also and to answer to Aladdin's successors for the consequences. However, this Tidewater did not do. The release instrument only cancelled by its very terms "its interest" in the leases, and not the full rights in these leases, the most valuable part of which were then owned by Waterbury.
It is also noted that the lease provides that Tidewater as lessee "may at any time prior to or after the discovery and production of minerals on the land, execute and deliver to Lessor or place of record a release or releases of any portions of the lands and be relieved of all requirements hereof as to the land surrendered...." Implicit in this provision is the right of Tidewater to preserve for its assignee or sublessee all rights not surrendered so long as the lease provisions are otherwise complied with.
The meaning and effect of the language "release, relinquish and quitclaim all of its rights, title and interest" has been considered by this Court in Waterman v. Tidewater Associated Oil Co., 213 La. 588, 35 So.2d 225 (1947). There the Court was concerned with a deed in which the grantor did "remise, release, sell, convey and Quit Claim" unto the grantee "all the right, title, interest, claim, and demand" which he had in and to the property conveyed. In discussing the effect of a quitclaim in Louisiana the Court said:
"Obviously, the declarations do not convey the land but only the right, title and interest of the vendor. It is in the nature of an assignment of a right or an interest and as such falls squarely within the category of the common law quitclaim deed."
Discussing the matter further the Court said:
"A quitclaim deed is one which purports to convey, and is understood to convey, nothing more than the interest or estate in the property described of which the grantor is seized or possessed, if any, at the time, rather than the property itself."
What this means under the facts of this case is that Tidewater relinquished its retained rights, not those conveyed by it to the Waterbury group. A contrary result is both harsh and not expressive of the intent of the parties.
In light of the lease provisions, the letter agreement, the language of the release, and the valuable rights the Waterbury group were then exercising, it is not reasonable to say that Tidewater intended to cancel those rights. We cannot subscribe to the conclusion of the Court of Appeal to the contrary.
For the reasons assigned, it is ordered, adjudged and decreed that the exceptions of res judicata of Robert L. Waterbury and Aladdin Oil Co., Inc., and its successors and assigns be and the same are hereby overruled.
It is further ordered, adjudged and decreed that the claims asserted herein (as landowners or lessees) by Mrs. Betty Jane Garber Ellis, Vernon J. Main, Jr., James *821 Braden, Mrs. Mildred Bollman, Donald S. Bollman, R. L. Bauman, Jon Rogers Bauman Trust, Michael Collins Bauman Trust, Adler V. LeDoux, Mrs. Mildred Moreau House, James Pitre and Burice C. Bihm, relating to, arising from or dependent upon the validity of the lease executed June 23, 1961 by Adler V. LeDoux, et al. to Vernon J. Main, Jr., recorded in Lease Book 240, Folio 334, under Entry No. 454,309 of the records of St. Landry Parish, Louisiana, and the Oil, Gas and Mineral Lease dated June 23, 1961 from Adler V. LeDoux et al. to Vernon J. Main, Jr., recorded in Lease Book 240, Folio 331, under Entry No. 454,308 of the records of St. Landry Parish, Louisiana, are hereby dismissed with prejudice, at their cost.
It is further ordered, adjudged and decreed that, in accordance with a stipulation, no distribution of the funds held in the registry of court will be made until all controversies over well costs and operating expenses are terminated, and then only upon proper order of court. The case is remanded to the trial court for this limited purpose, otherwise this judgment and decree shall be considered final in accordance with law.
BARHAM, J., concurs with reasons.
BARHAM, Justice (concurring).
The majority states that it pretermits the question of the legality of horizontal segregation of mineral leases. I cannot see how this issue was pretermitted when the very rights the majority has determined that Tidewater could not relinquish, because they had been conveyed to the Waterbury group, are rights in a horizontal segregation of a mineral lease. The right which Waterbury obtained from Tidewater was to undertake and restore production in Cockfield No. 2 Sand Unit No. 21-2. Thus it is necessary to determine that there can be a horizontal segregation of a mineral lease. In my opinion it has been so determined. In my opinion it has been correctly determined.
I respectfully concur.