850 So.2d 51 (2003)
FIVE N COMPANY, L.L.C. and Phyllis Sandra, as Curator for Peggy Gore Spacie
v.
Samuel Page STEWART, Joseph Richard Panno, Rally's Hamburgers, Inc. and Washington State Bank.
No. 2002 CA 0181.
Court of Appeal of Louisiana, First Circuit.
July 2, 2003.
Rehearing Denied August 13, 2003.
*53 Amy D. Berret, James P. Dore', Baton Rouge, Counsel for Plaintiffs/Appellants University Square, L.L.C., Phyllis Sandra and University House.
Ambrose V. McCall, New Orleans, Counsel for Defendants/Appellees Samuel Page Stewart and Joseph Richard Panno.
Charles A. Schutte, Jr., Baton Rouge, Counsel for Defendant/Appellee Rally's Hamburgers, Inc.
Before: KUHN, DOWNING, and GAIDRY, JJ.
KUHN, J.
Plaintiffs, University Square, L.L.C. ("University Square") and Phyllis Sandra, as curator for Peggy Gore Spacie, appeal two judgments of the trial court. One judgment granted a motion for summary judgment by defendants, Samuel Page Stewart and Joseph Richard Panno, and denied plaintiffs' cross-motion for summary judgment. The other judgment granted a motion for summary judgment in favor of defendant, Rally's Hamburgers, Inc. ("Rally's"), and dismissed plaintiffs' suit for injunctive and declaratory relief. While this appeal was pending, we ordered the substitution of University House at Northgate I, L.P. ("University House") as proper party plaintiff-appellant in lieu of University Square and Sandra. Pursuant to this appeal, we deny Stewart and Panno's exceptions of no right of action and res judicata, and we reverse that portion of the trial court's judgments that granted the defendants' motions for summary judgment. Pursuant to our supervisory jurisdiction, we also grant University's House's motion for summary judgment in part and remand for further proceedings.
At issue in this case is whether a tract of land, referred to herein as the 12-Foot Strip, is subject to the provisions of a lease agreement executed in 1987. This 2000 square-foot tract of land forms a 12-foot-wide border along two sides of a parcel of property (the "Corner Parcel") that is located at the corner of Highland and West *54 State Street in Baton Rouge, Louisiana. This "Corner Parcel" is adjacent to the University Shopping Center and its parking lot. When the trial court's judgments were signed, University Square[1] was the current owner of the University Shopping Center and its parking lot, which includes the 12-Foot Strip. At the time of the 1987 lease, however, Peggy Gore Spacie ("Spacie") (represented in the proceedings below by her daughter, Phyllis Sandra, as her curator) held 100% of the leasehold interest in the parking lot and the 12-Foot Strip; Five N Company, L.L.C. ("Five N Company"), University Square's predecessor, owned the parking lot and the 12-Foot Strip (subject to the leasehold); Theodore F. Cangelosi ("Cangelosi"), Spacie's former husband, owned a usufruct of an undivided 50% of the leasehold interest; and Stewart and Panno owned the Corner Parcel.[2]
In November 1987, Cangelosi executed an agreement that purported to lease the 12-Foot Strip to Gulf South Foods, Inc. ("Gulf South") d/b/a Rally's, which one month later assigned its rights as lessee to Stewart and Panno. In 1985, prior to Cangelosi's execution of the lease, Spacie executed a general power of attorney that authorized Cangelosi to act on her behalf. Cangelosi had signed other leases pursuant to this power of attorney. In those leases, Cangelosi had indicated that he was acting as Spacie's agent, but when he executed the 1987 lease in question, he signed only his name, making no reference to Spacie, her property interests, or the power of attorney. The text of the lease does not otherwise indicate that Cangelosi was acting on Spacie's behalf. Neither Spacie nor Five N Company signed the lease.
The parties dispute whether Cangelosi executed this lease of the 12-Foot Strip in his individual capacity as usufructuary, or whether he executed the lease in his representative capacity, as Spacie's mandatary. Appellants claim that because Cangelosi signed the lease only in his personal capacity, he leased only his usufructuary rights, which were extinguished upon his death in July 1992. Thus, appellants argue that Stewart and Panno's leasehold interests ceased in July 1992. Appellees assert that the lease is valid despite Cangelosi's death. They contend that Cangelosi effectively bound Spacie pursuant to the power of attorney, urging that Spacie's power of attorney did not require Cangelosi to sign in a representative capacity.

I. FACTUAL AND PROCEDURAL BACKGROUND
Pursuant to a 1963 lease agreement, Losavio Realty Co., Inc. ("Losavio Realty") leased the tract of land that encompasses the University Shopping Center parking lot and the 12-Foot Strip to Cangelosi. This lease initially provided for a 50-year term, but it was later amended to provide for a 70-year lease term, ending in the year 2037. When the lease was executed, Cangelosi was married to Spacie (known then as "Daisy Skardon Gore Cangelosi"). During 1975, Cangelosi and Spacie divorced. In 1980, pursuant to an agreement to exchange and a partition of community property between Spacie and Cangelosi, Cangelosi transferred his interest in the 1963 ground lease (covering the parking lot, the 12-Foot Strip, and other portions of the University Shopping Center) to Spacie. Thus, Spacie became the *55 owner of 100% of the leasehold interest in the parking lot and the 12-Foot Strip. Under the agreement to exchange, Cangelosi reserved only a usufructuary interest in an undivided 50% of the leasehold interest. The agreement to exchange and the partition were both recorded in the official records of East Baton Rouge Parish during 1980.
Thereafter, on September 26, 1985, Spacie executed a power of attorney that provided, among other powers, that Cangelosi had the power to "lease as Lessor ... for and on behalf of [Spacie] ... unto any person, firm or corporation interested in acquiring any such interest in, any and all property ... whether movable and/or immovable ... including ... property located within the Parish of East Baton Rouge, State of Louisiana." This power of attorney was also recorded in the official records of East Baton Rouge Parish. Pursuant to this power of attorney, Cangelosi managed all of Spacie's property in Baton Rouge, Louisiana, until December 17, 1991, when Spacie revoked the power of attorney.
On November 12, 1987, Cangelosi and Gulf South executed an instrument entitled, "Lease of Commercial Property (GROSS)." This document purported to lease the 12-Foot Strip for a period of 49 years, beginning on December 1, 1987, for $25,000. Rental payments were paid to Cangelosi during the years of 1987, 1988, and 1989. The parties do not dispute that this lease agreement was not recorded in the public records upon its execution. On December 10, 1987, Gulf South assigned its leasehold rights in the 12-Foot Strip to Stewart and Panno, and the assignment, with the 1987 lease agreement attached, was recorded in the official records of East Baton Rouge Parish.
Then, in December 1991, Spacie revoked her power of attorney, and in 1992, filed suit against Cangelosi and his then current wife, Kathleen Cangelosi ("Kathleen"). (Daisy (Peggy) Skardon Spacie vs. Theodore F. Cangelosi, et al, Suit No. 378,317, Div. "A", 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, referred to herein as "the 1992 suit"). Therein, Spacie alleged that Cangelosi was the manager of the University Shopping Center and her agent from 1973 through December 1991. Spacie alleged that at all times prior to October 1991, she had "blind confidence in [Cangelosi] as her agent and always did that which he advised, as she had a lack of understanding of such matters ...." The suit further alleged that Cangelosi had violated his fiduciary relationship with Spacie with respect to his handling of multiple real estate and financial transactions involving the University Shopping Center property and other properties jointly owned by Cangelosi and Spacie. Spacie sought an accounting from Cangelosi regarding his handling of her share of the properties and monies comprising the former community that existed between Cangelosi and Spacie. Spacie also sought various monetary damages and the rescission of purported sales and assignments of interests by Cangelosi to Kathleen.
Before the suit against Cangelosi could be resolved, he died in July 1992. In June 1994, a compromise agreement was reached between Kathleen, the Theodore F. Cangelosi succession (represented by Sandra, Cangelosi's daughter, in her capacity as administratrix), and Spacie (represented by her husband Roy W. Spacie ("Roy") as her curator). The compromise agreement resolved the allegations of the 1992 suit, along with the allegations of five other lawsuits involving claims by or against Cangelosi, Sandra (in her capacity as administratrix), Kathleen, or Spacie.[3] *56 Following the death of Roy, Sandra was appointed to serve as Spacie's curator in December 1994.
In May 1997, Five N Company and Sandra, in her capacity as Spacie's curator, filed this suit against defendants Stewart, Panno, and Rally's.[4] At the time this suit was filed, the parking lot and the 12-Foot Strip remained subject to the 1963 ground lease. Losavio Realty's interests had been transferred to Tessa Inc., who sold its interests to Five N Company in 1994. Thus, Five N Company owned the parking lot and the 12-Foot Strip, and Spacie was the ground lessee of both the parking lot and the 12-Foot Strip. Rally's was the lessee of the Corner Parcel pursuant to a 1993 lease agreement with Stewart and Panno, who owned the Corner Parcel.[5] Plaintiffs, Five N Company and Sandra, alleged that a building formerly used as a "Rally's" fast-food restaurant is located on the Corner Parcel and that the defendants have been trespassing on the 12-Foot Strip. The petition further alleged that defendants have constructed curbs and other improvements on both the parking lot and the 12-Foot Strip without the legal right to do so. Plaintiffs sought injunctive relief prohibiting the defendants from using or trespassing on the parking lot and the 12-Foot Strip. Plaintiffs also sought declaratory relief that: 1) the 12-Foot Strip is free from any leases or other encumbrances, including the 1987 lease of the 12-Foot Strip; and 2) defendants are not entitled to use the parking lot, including but not limited to the 12-Foot Strip.
Stewart and Panno answered the petition, admitting that Spacie had not personally signed the 1987 lease agreement between Cangelosi and Gulf South. They asserted, however, that the 1987 lease agreement was valid because Cangelosi had acted on Spacie's behalf when he signed it. Alternatively, they prayed that plaintiffs should be estopped from claiming that the lease agreement was null. Stewart and Panno also filed a third-party demand against Gulf South and Cangelosi, praying for indemnity and contribution.
Rally's also answered the petition, urging the 1987 lease agreement bound Spacie's interests. Additionally, Rally's filed a cross-claim against Stewart and Panno, asserting that in the event that the court declares the 1987 lease of the 12-Foot Strip to be invalid as to Spacie's interests, Rally's is entitled to have the Corner Parcel Lease declared null. Rally's maintained that the lease of the 12-Foot Strip was essential to its restaurant's operations because improvements constructed on the 12-Foot Strip provide parking and a driveway accessing one of the restaurant's drive-in windows.
After Five N Company merged into University Square in 1999, the trial court signed an order substituting University Square in lieu of Five N Company as proper party plaintiff. Plaintiffs, University Square and Sandra, filed a motion for summary judgment, contending Cangelosi had not executed the 1987 lease agreement on Spacie's behalf, and Spacie had not *57 executed the purported lease or consented to its execution.[6]
In response to plaintiffs' motion, Stewart and Panno filed an exception of res judicata, urging that the 1994 compromise agreement between the Cangelosi succession and Spacie barred the present action. Rally's also filed an exception of res judicata based on the 1994 compromise agreement and an exception of no right of action.[7]
In July 2001, the trial court held a hearing to address the exceptions. At that hearing, Sandra testified that she was the current manager of University Square, which at that time owned the properties comprising the University Shopping Center.[8] She acknowledged that University Square does not own the Corner Parcel and that she had made an offer to purchase the Corner Parcel from Stewart and Panno between 1995 and 1997 that was rejected. She sought to put the whole tract of land surrounding the shopping center together because it was difficult to manage in a piecemeal fashion. Sandra also testified that when the 1994 compromise was effected, she was aware of the 1987 lease, which purportedly affected the 12-Foot Strip.
Following the hearing on the exceptions, the trial court deferred consideration of the exceptions to a later date, upon which plaintiffs' motion for summary judgment had been scheduled for consideration. Thereafter, Stewart and Panno filed a motion for summary judgment, arguing that Cangelosi possessed authority to act on Spacie's behalf when the 1987 lease was executed. Stewart and Panno also argued that because Sandra and Five N Company (and its successor entities) were aware of the lease transaction involving Stewart and Panno before the 1994 Spacie/Cangelosi settlement agreement was executed, plaintiffs knowingly waived the right to bring any actions regarding the validity of the 1987 lease and its subsequent assignment.
During a September 24, 2001 hearing, the trial court pretermitted a ruling on the pending exceptions and rendered summary judgment in favor of Stewart and Panno. The trial court found that Cangelosi had exercised his authority to act on Spacie's behalf when he executed the 1987 lease.
Thereafter, Rally's filed a motion for summary judgment referencing the judgment rendered in favor of Stewart and Panno. On October 31, 2001, the trial court signed two written judgments. The first judgment granted Stewart and Panno's motion for summary judgment and denied plaintiffs' motion for summary judgment. The second judgment granted Rally's motion for summary judgment and dismissed all of the plaintiffs' claims. Sandra and University Square then appealed these judgments, urging that the trial court erred by: 1) granting Stewart and Panno's motion for summary judgment; 2) granting Rally's motion for summary judgment; *58 and 3) denying plaintiffs' motion for summary judgment.
Stewart and Panno answered plaintiffs' appeal, claiming the appeal is frivolous and seeking an award of damages and costs. Stewart and Panno also re-urged their exception raising the objection of res judicata and filed another exception raising the objection of no right of action with this court.[9]

II. ANALYSIS

A. No Right of Action
The peremptory exception pleading the objection of no right of action challenges whether plaintiff has an actual interest in bringing the action. La. C.C.P. art. 927 A(5); Northshore Capital Enterprises v. St. Tammany Hosp. Dist. #2, 01-1606, p. 4 (La.App. 1st Cir.6/21/02), 822 So.2d 109, 112, writ denied, 02-2023 (La.11/1/02), 828 So.2d 584. Whether a person has a right of action depends on whether the particular plaintiff belongs to the class in whose favor the law extends a remedy. Id. In other words, the exception questions whether the plaintiff has an interest in judicially enforcing the right asserted. Id. Whether a plaintiff has a right of action is a question of law. Therefore, it is reviewed de novo on appeal. Jackson v. St. Helena Parish Sheriff's Dep't, 01-2792, p. 2 (La.App. 1st Cir.1/8/02), 835 So.2d 842, 844. To prevail, the defendant must show that the plaintiff does not possess an interest in the subject matter of the suit. Id.
In support of the exception, Stewart and Panno have asserted that although Spacie died after the October 31, 2001 trial court judgment, plaintiffs have taken no action to substitute a party other than her curator as her representative. This court took judicial notice of Spacie's death, and by order dated March 5, 2003, we recognized that Sandra's authority as curator terminated upon Spacie's death. We ordered counsel for plaintiffs-appellants to formally designate and substitute Spacie's heirs and/or legal successors or assigns as plaintiffs-appellants in lieu of Sandra.[10] In response, University Square and Sandra filed a motion to substitute University House as proper party plaintiff, which was granted by this court on March 18, 2003. In support of University House's substitution, plaintiffs referenced evidence establishing that Spacie had transferred her interest in the subject property to University Shopping Center, Five N Company and University Shopping Center had merged into University Square, and University Square had became the sole owner of the subject property. Plaintiffs further represented that University Square had subsequently entered into a contract of sale regarding the subject property, which has been sold to University House, and that all litigation rights pertaining to the *59 property have been assigned to University House.
Prior to the substitution of University House, Stewart and Panno had likewise asserted that University Square and Spacie had sold all rights in the property at issue, i.e. the University Shopping Center, to University House after the trial court judgment was signed.[11] Stewart and Panno maintained that since University Square and Spacie had assigned all litigation rights and liabilities in this proceeding to University House, they currently have no existing rights in this proceeding. Because University House has been substituted as proper party plaintiff, Stewart and Panno's exception of no right of action is now moot. But even if we had not ordered the substitution, we find that Stewart and Panno's arguments had no merit.
Although the peremptory exception pleading the objection of no right of action challenges whether plaintiff has an actual interest in bringing the action, Stewart and Panno had not argued that either University Square or Spacie did not have an actual interest in enforcing their claims. Stewart and Panno had merely contended that they could no longer pursue these claims because the transfer to University House had taken place. However, La. C.C.P. art. 807 provides, "When a party to an action transfers an interest in the subject matter thereof, the action shall be continued by or against such party, unless the court directs that the transferee be substituted for or joined with the transferor." Thus, notwithstanding a substitution based on the alleged transfer, University Square and Sandra would have properly continued this action as the parties who were involved in this litigation at the time of the trial court's judgments. See Seale v. Abadie, 99-771, p. 4 (La.App. 5th Cir.1/12/00), 752 So.2d 971, 973. Accordingly, the exception raising the objection of no right of action is denied.

B. Res Judicata
Although Stewart and Panno filed the exception raising the objection of res judicata in the trial court proceedings, the trial court's judgments were silent regarding the exception. Usually, when a trial court judgment is silent as to an exception, it is presumed that the trial court denied the exception. Bogalusa Community Medical Center v. Batiste, 603 So.2d 183, 187 (La.App. 1st Cir.1992); R.A.K. v. Employees Group Ben. Program, 558 So.2d 633, 634, n. 1 (La.App. 1st Cir.1990). But in this case, because the trial court expressly stated that it was not considering the exception, and since Stewart and Panno have re-urged the exception in this court, we will treat the exception as though it were being raised for the first time rather than as a review of an implicit denial of the exception.[12]
Various claims between Spacie and the Succession of Cangelosi were resolved pursuant to the 1994 compromise agreement that resolved the lawsuits involving Cangelosi, Sandra, Kathleen, and Spacie. Thereafter, pursuant to a joint *60 motion and order dated August 10, 1994, the claims settled in the 1994 compromise agreement were declared adjudged by the court and any claims that were not settled were dismissed with prejudice. Stewart and Panno assert that the release language of the compromise agreement and the August 1994 judgment bar the present claims of University House (and the previous plaintiffs-appellants). Specifically, they allege that University House "is barred from complaining about the effects or consequences of leases entered into by Cangelosi involving the University Shopping Center." They contend, "[A]ll claims against Cangelosi, his successors or assignees, disputing such leases, were resolved or disposed of by the Compromise Agreement and the District Court's prior judgment."[13]
There is no question that a compromise or transaction has a force equal to the authority of the things adjudged. La. C.C. art. 3078. A valid compromise is appropriately raised as a bar to litigation via the objection of res judicata. Brown v. Drillers, 93-1019, p. 6 (La.1/14/94), 630 So.2d 741, 747. As amended by Act No. 521 of 1990, effective January 1, 1991, Louisiana's res judicata statute, La. R.S. 13:4231, provides:[14]
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
The party raising the objection of res judicata bears the burden of proving the essential facts to support the objection. Diamond B Const. Co., Inc. v. Dep't of Transp. and Dev., 02-0573, p. 8 (La. App. 1st Cir.2/14/03), 845 So.2d 429. The doctrine of res judicata is not discretionary and mandates that final judgments be given effect. Id. The doctrine, however, cannot be invoked unless all its essential elements are present. It is strictly construed, and any doubt concerning its applicability *61 is to be resolved against the party raising the objection. Mandalay Oil & Gas, L.L.C. v. Energy Development Corp., 01-0993, p.7 (La.App. 1st Cir.7/03/02),___ So.2d___,___, 2002 WL 1434422.
"Res judicata," as referenced in La. R.S. 13:4231, encompasses both claim preclusion (res judicata) and issue preclusion (collateral estoppel) as previously explained by this court in Diamond B Const., 02-0573 at pp. 9-10, 845 So.2d at 435-36:
Under claim preclusion, a res judicata judgment on the merits precludes the parties from relitigating matters that were or could have been raised in that action. Under issue preclusion or collateral estoppel, however, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties. Thus, res judicata used in the broad sense has two different aspects: 1) foreclosure of relitigating matters that have never been litigated but should have been advanced in the earlier suit; and 2) foreclosure of relitigating matters that have been previously litigated and decided.
But despite the wide scope of the doctrine contemplated by La. R.S. 13:4231, a plea of res judicata cannot be raised against a litigant who was neither a party to the former suit nor the successor to the rights of one of the parties of the former suit. Sun Finance Co., Inc. v. Jackson, 525 So.2d 532, 534 (La.1988); Kibodeaux v. Kibodeaux, 93-1143, p. 3 (La.App. 3d Cir.4/6/94), 635 So.2d 530, 532. Even after its amendment, La. R.S. 13:4231 requires "identity of the parties" to preclude a subsequent suit, by providing that "a valid and final judgment is conclusive between the same parties." Burguieres v. Pollingue, 02-1385, p. 5 (La.2/25/03), 843 So.2d 1049. There exists an identity of parties whenever the same parties, their successors, or others appear so long as they share the same "quality" as parties. Welch v. Crown Zellerbach Corp., 359 So.2d 154, 156 (La. 1978); Horrell v. Horrell, 99-1093, p. 5 (La.App. 1st Cir.10/6/00), 808 So.2d 363, 374. Identity of parties is satisfied when a privy of one of the parties is involved. Burguieres v. Pollingue, 02-1385, p. 5 n.3, 843 So.2d at 1052. In its broadest sense, "privity" is the mutual or successive relationship to the same right of property, or such an identification in interest of one person with another as to represent the same legal right. Noel v. Jumonville Pipe & Machinery Co., 245 La. 324, 336, 158 So.2d 179, 184 (1963), quoting 72 C.J.S. Privity; Privies; Privy, pp. 954-956. In connection with the doctrine of res judicata, a "privy" is "one who, after the commencement of the action, has acquired an interest in the subject matter affected by the judgment through or under one of the parties, as by inheritance, succession, purchase or assignment." Black's Law Dictionary 1200 (6th ed.1990).
Relying on Ditch v. Finkelstein, 399 So.2d 1216, 1222 (La.App. 1st Cir.1981), Stewart and Panno argue that they are in privity with Cangelosi and, thus, that the current suit is barred based on the prior compromise agreement and judgment involving the Cangelosi succession. In Ditch v. Finkelstein, this court held that the res judicata requirement of identity of the parties was met where a successor or privy of one of the parties to the compromise was involved. Ditch involved a suit between the heirs of five parties to a compromise and the successors in title of the sixth party to the compromise. The court held that all the parties involved in the lawsuit were successors to the original redactors of the compromise agreement and were, *62 therefore, the same parties "in the legal sense of the word." Id.[15]
But Stewart and Panno's reliance on the Ditch case is misplaced; it does not support their claim of privity. In the present case, Stewart and Panno were neither parties to the compromise agreement nor successors to any of the parties or property rights involved in the compromise agreement. Although Stewart and Panno's claimed interest in the 12-Foot Strip derives from Cangelosi, as the lessor of the property, Stewart and Panno are not Cangelosi's successors or his privies insofar as the compromise agreement is concerned. Stewart and Panno do not have the same rights of property that the succession had at the time of the compromise. Whatever rights were derived from the lease agreement with Cangelosi were derived prior to the execution of the compromise agreement. The lease agreement was executed in 1987, and the compromise agreement was executed in 1994. Stewart and Panno's interests in the 12-Foot Strip are not derivative from the 1994 compromise agreement and related judgment. Likewise, none of Stewart and Panno's interests were acquired after Spacie instituted the 1992 suit that was resolved by the 1994 compromise. Accordingly, we find that Stewart and Panno do not now appear in this suit in the same quality or capacity that Sandra appeared when she executed the 1994 compromise agreement on behalf of Cangelosi's succession. We do not find these parties are the same in the legal sense of the word. Thus, because Stewart and Panno have not established the "identity of the parties" element that is required for res judicata, the compromise agreement and related judgment do not preclude this suit. We deny the exception of res judicata.[16]

C. Motions for Summary Judgment
We note that the denial of a motion for summary judgment is an interlocutory judgment that is not appealable absent a showing of irreparable injury. See La. C.C.P. arts. 968, 1841, 2083; Pitts v. Fitzgerald, 01-0543, p. 5 n.8 (La.App. 1st Cir.5/10/02), 818 So.2d 847, 850. In the present case, plaintiffs have made no showing of irreparable injury. But we note that the issues addressing the effect of the 1987 lease are the same in each of the parties' motions for summary judgment. Thus, in the interests of judicial economy and because plaintiffs have challenged the denial of their motion in connection with other appealable judgments (the two judgments granting summary judgment in favor of the defendants), we will treat that portion of this appeal that seeks review of the denial of plaintiffs' motion for summary judgment as an application for supervisory writs. See Trahan v. Prudential Property & Cas. Ins. Co., 97-2470, p. 3 (La.App. 1st Cir.5/14/99), 739 So.2d 811, 813. We grant that application, however, only insofar as the issues raised therein are the same as those raised in the defendants' motions for summary judgment. The application is otherwise denied. Accordingly, we address whether the 12-Foot Strip is subject to the provisions of *63 the 1987 lease but we do not reach the issues of whether the trial court erred in denying plaintiffs' request for declaratory relief addressing other portions of the parking lot and in denying plaintiffs' request for injunctive relief.

1. Summary Judgment Law and Standard of Review
Summary judgment procedure is favored in Louisiana. La. C.C.P. art. 966 A(2). A motion for summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La. C.C.P. art. 966 B. When a party moves for summary judgment, he bears the initial burden of proving that no genuine issue of material fact exists. La. C.C.P. art. 966 C(2). Once the mover has met this initial burden and if the non-movant bears the burden of proof at trial on the issue before the court, then the burden shifts to him to present evidence demonstrating that material factual issues remain. La. C.C.P. art. 966 C(2). Barrios v. Wal-Mart Stores, Inc., 00-2138, p. 2 (La.App. 1st Cir.12/28/01), 804 So.2d 905, 907, writ denied, 02-0285 (La.3/28/02), 812 So.2d 636. When addressing legal issues raised by a motion for summary judgment, this court gives no special weight to the findings of the trial court. It conducts a de novo review of questions of law and renders a judgment on the record. Campbell v. Market American Ins. Co., 00-1448, p.5 (La.App. 1st Cir.9/21/01), 822 So.2d 617, 620, writ denied, 01-2813 (La.1/4/02), 805 So.2d 204.

2. Validity of Lease after Theodore Cangelosi's death
University House does not seek a declaration that the 1987 lease and assignment were invalid but rather a declaration that the rights transferred under the lease and assignment were extinguished upon Cangelosi's death in 1992. La. C.C. art. 567 provides in part, "The usufructuary may lease, alienate, or encumber his right. All such contracts cease of right at the end of the usufruct." La. C.C. art. 607 states, "The right of usufruct expires upon the death of the usufructuary." Likewise, La. C.C. art. 2730 sets forth in part, "A lease made by one having a right of usufruct, ends when the right of usufruct ceases."[17] Therefore, if Cangelosi's signature on the 1987 lease did not legally bind Spacie, then Stewart, Panno and Rally's rights under the 1987 lease were extinguished upon Cangelosi's death in 1992. Thus, we consider whether Spacie was bound by Cangelosi's act of signing the 1987 lease in his individual capacity while holding a general power of attorney to act on Spacie's behalf.
When Spacie executed the general power of attorney in 1985 and when Cangelosi executed the lease in 1987, La. C.C. art. 2985 provided that a "mandate " or "letter of attorney " is "an act by which one person gives power to another to transact for him and in his name, one or several affairs."[18] In the present case, University House does not challenge that Cangelosi held a mandate to act on Spacie's behalf when the lease was executed. University *64 House asserts, however, that Cangelosi did not exercise this mandate when he executed the lease, evidenced by the fact that the lease contains no reference to Cangelosi's status as mandate or agent for Spacie. In support of the motion for summary judgment, plaintiffs submitted copies of numerous leases involving other real estate transactions that were signed by Cangelosi and specifically indicated that he was acting pursuant to Spacie's power of attorney. Plaintiffs argued that these leases established that when Cangelosi signed as mandatary for Spacie, that fact was clearly reflected in the lease documents by references to Spacie's name identifying her as lessor, by references to Cangelosi as her agent, and/or references to the recorded power of attorney that authorized Cangelosi to act as Spacie's agent.
In further support of their motion, plaintiffs submitted Stewart's deposition testimony and answers to interrogatories by Stewart and Panno. In Stewart's deposition, he explained that he never spoke with Cangelosi; Gulf South's representative handled all negotiations before the assignment. Stewart knew that someone else owned the property but understood that Cangelosi was its manager. Because no one else's name was discussed, Stewart believed Cangelosi was in charge of the 12-Foot Strip. Stewart and Panno's answers to interrogatories established that no abstract or title exam had been performed by them, or on their behalf, prior to the lease assignment. Stewart acknowledged that he first learned of Spacie's interest in the 12-Foot Strip when the current lawsuit was filed.
Stewart and Panno supported their cross-motion for summary judgment by submitting Sandra's deposition. It confirmed that after Spacie and Cangelosi divorced, Cangelosi had managed various properties, which he and Spacie had previously jointly owned, until his death. Sandra's deposition testimony also established that prior to 1992, Cangelosi was the manager of the shopping center and the only person whom she was aware of who had entered into leases involving the University Shopping Center property.
Stewart and Panno argue that Spacie's power of attorney did not require Cangelosi to sign in a representative capacity when he executed the 1987 lease. In support of that proposition, they cite only Martin Fuel Distributors, Inc. v. Trans Gulf Fuel, Inc., 496 So.2d 473 (La.App. 1st Cir.1986), writ denied, 498 So.2d 753 (La.1986), wherein this court found that an agent's failure to indicate his representative capacity when signing a lease amendment on behalf of the principal did not invalidate the transaction.
In Martin Fuel, numerous real estate transactions occurred that were all recorded in the official records of Lafourche Parish. In 1933, L.E. Daviet & Company, Inc. sold a certain tract of land to L.E. Daviet and his wife, Alice Guidroz Daviet. In 1944, L.E. Daviet leased the property to Southport Petroleum Company of Delaware ("Southport") for a term of 15 years. The lease was later amended to extend the lease term until 1974, and to grant Southport the right to renew the lease for an additional 15 years with the renewal ending in 1989. Southport's successor, Esso Standard Oil Company ("Esso"), and L.E. Daviet signed the lease amendment. In 1959, Alice Guidroz Daviet and L.E. Daviet conveyed the property to L.E. Daviet Company, a partnership consisting of his children, Leslie L. Daviet, Claude E. Daviet, Louis E. Daviet, Jr., and the Dominican Trust, a trust created by Alice Guidroz Daviet and L.E. Daviet. In 1965, the partnership members gave L.E. Daviet a power of attorney that authorized him to manage all of the property owned by them and *65 specifically included "[t]he power to sign leases."
In 1965, L.E. Daviet and Esso's successor, Humble Oil and Refining Company, entered into a second amendment to the original lease agreement, which granted the lessee the right to renew the lease until 2004. When L.E. Daviet executed this amendment, he did not sign in a representative capacity and did not attach a copy of the power of attorney to the transaction.
In 1971, L.E. Daviet Co. conveyed the property to Larry Dale Sauder and Donna M. Schutt Sauder. The act of sale stated that all or a portion of the property may be "subject of a lease by L.E. Daviet to [Esso], dated June 15, 1944" and "subject to additional agreements with [Esso] dated December 22, 1965 and on April 15, 1959." In 1979, the Sauders sold the property to Sauder Inventions, Inc. This act of sale also referenced the original lease and the lease extensions.
In 1981, Martin Fuel Distributors, Inc ("Martin Fuel") purchased the property from Sauder Inventions, Inc., with the act of sale referencing the 1971 act of sale from L.E. Daviet Co. to the Sauders. In August 1983, Exxon Corporation, as successor of Humble Oil and Refining Company, assigned and transferred all of its rights in the lease and its subsequent amendments to Trans Gulf Fuel, Inc ("Trans Gulf"). Thereafter, Martin Fuel filed suit against Trans Gulf, seeking a declaratory judgment that the 1965 lease amendment, which granted the option to renew the lease until 2004, was null and void. The trial court determined that the 1965 lease amendment was invalid.
Trans Gulf appealed, urging that the lease amendment was valid because L.E. Daviet had acted as L.E. Daviet Company's agent when he signed the 1965 lease amendment. Martin Fuel conceded that L.E. Daviet had actual authority to act on behalf of L.E. Daviet Company, but argued that because L.E. Daviet had not disclosed his agency status, the lease amendment was invalid. This court reversed the lower court, holding that L.E. Daviet's action of signing the 1965 lease amendment bound his principal to the agreement and that all subsequent purchasers, including Martin Fuel, purchased the property subject to the original lease and its amendments.
The Martin Fuel court reasoned that a cursory examination of the public records revealed that: 1) the original lessee and its assignees had the option to renew the lease until 2004, 2) pursuant to a recorded power of attorney, L.E. Daviet had actual authority to execute the lease amendments on L.E. Daviet Company's behalf, 3) the property had been transferred in 1971 and 1979 subject to the original lease and subsequent lease amendments, and 4) the lease was in effect after the initial 15-year term had expired. Based on these particular facts, the court held that Martin Fuel had knowledge of the recorded instruments and that the language of these documents "fairly put them on notice that the property was potentially burdened with a currently effective lease." Thus, despite L.E. Daviet's failure to indicate his representative capacity when signing the lease amendment on behalf of the partnership, this court found the lease amendment was valid.
After reviewing the unique facts of the present case, we find that the holding of Martin Fuel is not controlling. The public records revealed Spacie's interest in the property when the 1987 lease was executed, but because Stewart and Panno did not conduct a title examination, they did not learn of Spacie's ownership interest until after the lease assignment was executed. Additionally, Stewart and Panno introduced *66 no evidence establishing that they or Gulf South was aware of or had relied on the power of attorney authorizing Cangelosi to act on Spacie's behalf. Even if they had, however, their reliance would have been unfounded due to a distinguishing factor in this case. In addition to holding the power of attorney to act on Spacie's behalf, Cangelosi held his own property interest in the 12-Foot Strip; Cangelosi held a usufructuary interest that could be leased, alienated, or encumbered. In Martin Fuel, L.E. Daviet held no interest in the subject property at the time that he executed the challenged lease assignment and his actions were unquestionably on behalf of the partnership that he represented. In the present case, because both Spacie and Cangelosi had property interests in the 12-Foot Strip that could be separately leased, alienated, or encumbered, it was necessary for Cangelosi to indicate that he was acting on Spacie's behalf in order to lease her property interests as well as his own. If we were to hold otherwise, we would create considerable confusion and instability in our public records. The only way to prevent such negative results and to ensure that third parties will know with whom they are dealing is to require that such an individual designate the particular capacity in which he acts.
Based on the facts of this case, we conclude that an individual who holds an interest in property and also holds the capacity to act in a representative capacity for another's interest in that property must designate the particular interest that he purports to effect. Otherwise, his signature affects only his individual interests. Because Cangelosi signed the lease agreement without referencing Spacie or indicating that he was acting on her behalf, or otherwise referencing Spacie's interests in the property, we conclude his actions did not affect her interests in the property.
Thus, we find that the lease between Cangelosi and Gulf South Foods, Inc. affected only Cangelosi's usufructuary interest, which was extinguished upon his death in July 1992. It follows that Stewart and Panno's rights based on the lease assignment and Rally's rights, as Stewart and Panno's lessee, were also extinguished upon Cangelosi's death.
Accordingly, because we find that the defendants' rights were extinguished upon Cangelosi's death, they were not entitled to judgment as a matter of law. Thus, we reverse that portion of the trial court's judgments that granted the defendants' motions for summary judgment. Pursuant to our supervisory jurisdiction, we also reverse that portion of the trial court's judgments that denied plaintiffs-appellants' motion for summary judgment and dismissed their claims. We grant University House's motion for summary judgment in part by declaring that the 12-Foot Strip is free from any leases in favor of defendants Stewart, Panno, and Rally's. We further declare that defendants do not have a right to use or permit others to use the 12-Foot Strip. As explained above, we do not reach the issues of whether University House is entitled to: 1) injunctive relief prohibiting the defendants from using or trespassing on the parking lot and the 12-Foot Strip, and 2) declaratory relief addressing defendants' use of other portions of the parking lot. Accordingly, we remand this matter for further proceedings on those issues and for consideration of the defendants' third-party demands.

D. ANSWER TO APPEAL
Stewart and Panno contend that this appeal is frivolous and that they are entitled to damages as asserted in their answer to the appeal. This contention is *67 unfounded since we have found the appeal has merit. Rivers v. Groth Corp., 95-2509, p. 3 (La.App. 1st Cir.9/27/96), 680 So.2d 762, 763.

III. CONCLUSION
For the above reasons, we deny Stewart and Panno's peremptory exceptions raising the objections of no right of action and res judicata. We reverse the trial court's judgments. Pursuant to our supervisory jurisdiction, we also consider plaintiffs' appeal of the denial of its motion for summary judgment as an application for supervisory writs. Based on our determination that defendants-appellees' rights under the 1987 lease were extinguished upon Cangelosi's death in 1992, we grant plaintiffs' motion for summary judgment in part by declaring that the 12-Foot Strip is no longer burdened by the 1987 lease or its assignment. As to University House's claims for injunctive relief and declaratory relief addressing defendants' use of other portions of the parking lot, we deny the application for supervisory writs and remand this matter for further proceedings.
EXCEPTIONS RAISING THE OBJECTIONS OF NO RIGHT OF ACTION AND RES JUDICATA DENIED; JUDGMENTS REVERSED; WRIT GRANTED IN PART AND MADE PEREMPTORY; WRIT DENIED IN PART; JUDGMENT RENDERED AND MATTER REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Although Five N Company, L.L.C. initially filed this suit, it later merged into University Square, which was later substituted in the trial court proceedings as proper party plaintiff.
[2] Spacie's leasehold interest was subsequently transferred to University Shopping Center, L.L.C., which also later merged into University Square, L.L.C.
[3] In April 1994, the application to affect the compromise agreement was filed in "In The Matter of the Succession of Theodore Francis Cangelosi a/k/a Theodore F. Cangelosi a/k/a Theo F. Cangelosi," Probate No. 57,089, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.
[4] Plaintiffs also named Washington State Bank, who allegedly held a mortgage on the Corner Parcel, as a defendant. All claims against Washington State Bank and the cross-claim that it filed were later dismissed with prejudice. Washington State Bank is not involved in this appeal.
[5] The lease was actually signed by Rally's Inc., who was the predecessor of Rally's Hamburgers, Inc.
[6] Defendants do not contend that either Five N Company or University Square has leased the 12-Foot Strip to Gulf South Foods, Stewart, or Panno.

The trial court denied earlier motions for summary judgment filed by both plaintiffs and Stewart and Panno.
[7] Stewart and Panno also filed an exception of no cause of action that was denied and that is not pertinent to this appeal.
[8] Spacie explained that the shopping center property was no longer subject to a lease due to Spacie's transfer of her leasehold interests to University Shopping Center and due to the merger of Five N Company and University Shopping Center into University Square. At that time, Spacie owned a large interest in University Square.
[9] We consider this peremptory exception filed for the first time in this court because the parties do not dispute any of the facts that form the grounds of the exception and it was pleaded prior to a submission of the case for a decision. See La. C.C.P. art. 2163; Parish Nat. Bank v. Ott, 02-1562, p. 2 (La.2/25/03), 841 So.2d 749. Although a plaintiff may demand that a case be remanded to the trial court for a trial of an exception, University House has not made such a demand and argues that the exception should be denied.
[10] Spacie had transferred her leasehold interests to University Shopping Center, and Five N Company and University Shopping Center had merged into University Square prior to the time that the October 31, 2001 judgments were signed. The order of substitution substituted University Square in lieu of Five N Company but did not address Sandra, as curator for Spacie. Thus, even though Spacie no longer owned any interest in the subject property, Sandra remained a plaintiff in the suit.
[11] Although Stewart and Panno did not contest any of the underlying facts that support the substitution of University House as the proper-party plaintiff, they opposed the substitution on the basis that plaintiff's claim to the leasehold rights had been abandoned. This opposition is baseless and appears to be without purpose other than to delay this court's resolution of the merits of this case.
[12] In September 24, 2001 oral reasons for judgment, the trial court stated, "I am going to address the cross-motions for summary judgment and forego the exceptions of res judicata and no right of action at this time."
[13] Stewart and Panno also argue that because University Square and Sandra knew of the 1987 lease before the compromise agreement was executed, University House should be estopped from pursuing this litigation. Equitable estoppel is defined as "the effect of the voluntary conduct of a party by which he is barred from asserting rights or defenses against another party justifiably relying on such conduct and causing him to change his position to his detriment as a result of such reliance. The three elements of estoppel are: (1) a representation by action or word; (2) justifiable reliance on the representation; and (3) a change in position to one's detriment because of the reliance." Murphy v. Gilsbar, Inc., 02-0205, p. 4 (La.App. 1st Cir. 12/31/02), 834 So.2d 669, 672. We find no merit in this argument because Stewart and Panno made no showing that any of their actions were based on any reliance on representations made by Sandra, Spacie, or University House.
[14] Because the present suit was filed and the compromise agreement was entered into after the 1990 amendment of La. R.S. 13:4231, the parties do not dispute its applicability.
[15] In support of its holding, the Ditch court cited two cases that also involved successors in title, Scurlock Oil Company v. Getty Oil Company, 294 So.2d 810 (La. 1974) and Quinette v. Delhommer, 247 La. 1121, 176 So.2d 399 (1965). In Quinette, 176 So.2d at 405, the court explained that "[u]nder the civil law doctrine, the ayants cause, or successors, of the parties of record are considered parties to the demand when they acquire title after the institution of the original suit in which judgment is rendered." (Footnote omitted).
[16] Because we find that Stewart and Panno failed to establish the "identity of the parties" element of their res judicata claim, we pretermit any analysis regarding the scope of the compromise agreement.
[17] La. C.C. art. 628 provides in part, "Upon termination of a usufruct of nonconsumables... full ownership is restored. The usufructuary or his heirs are bound to deliver the property to the owner ..."
[18] Book III, Title XV, of the Louisiana Civil Code of 1870 (of Mandate), consisting of Articles 2985 to 3034, was revised, amended and re-enacted by Accts 1997, No. 261, § 1, effective January 1, 1998, to consist of Articles 2985 to 3032.